STATE OF MISSOURI, Respondent, v. MARVEL BLACK, Appellant, No. 41581—227 S. W. (2d) 1006.

Division Two, March 13, 1950.

262

*Roy Hamlin* for appellant.

*J. E. Taylor,* Attorney General, and *Lawrence L. Bradley,* Assistant Attorney General, for respondent.

▇▇▇▇▇ TIPTON, J.—In the circuit court of Marion County, Missouri, the appellant was convicted of manslaughter for killing his daughter Geneva Lorene Black, and his punishment was assessed at imprisonment in the county jail for one year. From this judgment he has duly appealed.

His first assignment of error is that the trial court erred in overruling his motion to quash the indictment returned by the grand jury against him. In his motion he contends that the indictment is so vague, verbose and conflicting that no accused could prepare a defense nor anticipate for what he was being put in jeopardy. The indictment states that the appellant "on or about the 25th day of January, one thousand nine hundred forty seven, * * * with force and arms, * * * did make an assault, * * * with his hands and fists * * * in and upon the head and body * * * did strike, knock, hit, beat and wound, giving to the said Geneva Lorene Black, * * * one mortal blow, bruise, contusion, laceration and wound, of which said mortal blow * * * and wound the said Geneva Lorene Black, on the 26th day of January, one thousand nine hundred forty seven at the Township of Mason, County of Marion and State of Missouri, did die."

▇▇ We are of the opinion that this indictment clearly informed the appellant that he was accused of killing Geneva by striking and beating her upon the head and body with his hands and fists and that as a result of said striking and beating she died. It is not subject to appellant's charge that it was merely "a 'shot gun' accusation in the hope of having something develop upon which appellant could be convicted." Since the indictment omits the elements of first and second degree murder, it sufficiently charges the crime of manslaughter. State v. Holliday, 353 Mo. 397, 182 S. W. 2d 553.

▇▇ Appellant contends that the trial court erred in overruling his motion to suppress his evidence, his wife's evidence, his daughter's evidence and his son's evidence, taken at the coroner's inquest in reference to the death of Geneva. These four people were duly subpoenaed to appear before the coroner's jury. The appellant was duly sworn and testified that his name was Marvel Black and he was the father of deceased. Then the prosecuting attorney of Marion County asked him the following questions:

"Q. Mr. Black, I do not know what this inquest will bring out. There is a possibility that you may not want to testify. I want to

advise you now that you are not required to testify if you think that it will jeopardize you in any way. You have a constitutional right not to do so. In view of this right, do you want to tell us what you know about this situation? A. Yes, sir. It is just like I told you yesterday . . .

Q. You made a voluntary statement to officer Blackburn and me yesterday? A. Yes. I believe that was his name."

On the motion to suppress the appellant testified that he went only to the fourth grade in school, that he did not know what was meant by his constitutional rights in regard to testifying at the coroner's inquest, and that he did not have an attorney. The record of the testimony at the inquest showed that neither the appellant nor his wife was warned that her testimony could be used against appellant, nor was there any warning given the two children of appellant.

The court ruled on each of these four witnesses separately. He held that regardless of whether Mrs. Black and the children had been warned of any constitutional rights, their testimony could not be admitted as evidence against the appellant but could be used for impeachment purposes in their cross-examination in the event they were put on the witness stand by the appellant. The trial court ruled that appellant had been sufficiently warned in very clear, understandable language of his constitutional rights.

We agree with the trial court that appellant had been warned in clear, understandable language of his constitutional rights. We think his answers to the questions set out above indicate that he understood the warning and the court properly overruled that part of the motion to suppress the testimony of the appellant.

There is some ambiguity in the record as to whether the testimony of the appellant was used by the state in its evidence in chief or used only for impeachment purposes in cross-examination. Under the law, if it was not given voluntarily, then it would be inadmissible either in chief or in cross-examination. State v. Burnett, 206 S. W. 2d 345, and cases cited therein. But we are of the opinion that appellant voluntarily testified at the coroner's inquest and he therefore waived his constitutional rights for the reason that he understood the warning given by the prosecuting attorney at the inquest. State v. McDaniel, 336 Mo. 656, 80 S. W. 2d 185.

However, there is nothing in the record to show that the appellant was warned that his wife could not testify against him. Section 4081, R. S. Mo., 1939, Mo. R. S. A., provides that no person on trial or examination, nor wife or husband of such person, shall be required to testify. Under the circumstances in this case the appellant did not voluntarily waive his legal rights when his wife testified at the coroner's inquest, and her testimony given there should not have been used in her cross-examination at the trial, even if used only to impeach her. State v. Burnett, supra. But we have carefully

searched appellant's motion for a new trial and fail to find any assignment of error that would preserve this question for our review. ▮ Appellant's next two assignments of error go into the sufficiency of the evidence to sustain a verdict finding the appellant guilty of manslaughter. The evidence most favorable to the state is as follows: The deceased was a little over sixteen years old and was employed as a domestic in the home of Mr. and Mrs John Miller in Hannibal, Missouri. In the afternoon of January 25, 1947, the mother of the deceased called her by telephone at the Miller home and requested her to come home, which she did for a short while. Upon arriving home she was questioned by her parents about $15.00 she had obtained from a Mr. Hemme by device of a note purportedly written by her mother requesting a loan of $15.00. After some questioning she finally admitted that she had written the note and got the money. Appellant then told her if that was the way she was going to act for her to get her clothes and come home. No corporal punishment was administered to her at this time.

After the deceased returned to the Miller home, Mrs. Miller heard her crying in her bedroom. A little later Mrs. Miller saw [1009] her in the bathroom vomiting and she continued to vomit off and on for some time. Mrs. Miller and her husband went in a car to appellant's home and informed the Blacks of the deceased's illness. The appellant stated he would go after her and said, "I will go down and give her a good beating like I did one of my other girls, that is what she needs." As he left with the Millers he said to his wife, "If I'm not back in a few minutes you can come to the police station after me." The group then drove back to the Miller home and on arriving found the deceased in the bathroom vomiting. Appellant told deceased to get up and get her clothes. After an interval deceased went to her bedroom and Mrs. Miller helped her pack. Appellant and deceased left in a taxi. The driver of the taxi testified that deceased said nothing on the way home but was whimpering like she had been crying. He heard the appellant say to her, "You think you feel bad now, wait until I get you home." When they got to the Black home, deceased got out of the taxi unassisted and she and appellant went into the house.

Appellant immediately asked deceased what she had done with the $15.00 and she refused to answer. When she refused to answer, according to appellant, he slapped her with his open hand four or five times. Deceased went to bed and appellant heard her vomiting during the night. He told her to get up and get a pan, and not to vomit on the clean floors. He stated that one time during the night he heard her fall or stumble into a chair in the kitchen.

Appellant testified that the Black family arose about 5:00 the next morning but deceased stayed in bed. While the rest of the family was at breakfast deceased was heard to go outside toward the outdoor

toilet. She did not return in a reasonable length of time so appellant picked up a switch about the size of a lead pencil and went out to see about her. He found her lying face down on a concrete side walk. She was dressed in a nightgown, house coat and slippers. He told her to get up and she did with his help. Just as she got to the doorway, he struck her several times about the buttocks and legs with the switch. She went into the house and went to bed. He then went to work at the cement plant. The other children later went to Sunday school. When they returned they went into deceased's bedroom to show her their Sunday school papers. After leaving the room they told their mother that she looked "funny." When the mother went in the room she found her eyes rolled back in her head.

Dr. W. P. Birney, the family doctor, was called and he arrived about 1:00 P. M. Sunday. He found that she was dead. He removed her clothing and examined her head and body. He found that there were several bruises on her face and her lips were swollen and bruised; there was a bruise at the corner of her eye, a whitish place on the side of her nose, the pupils of her eyes were widely dilated, there was blood in her nose and an ugly looking bruise on the point of her chin that looked as "if the chin came into violent contact with the side walk or some granitoid surface." He refused to sign the death certificate without an autopsy. He and Dr. Lucke performed one the next day and they found a brain hemorrhage resulting in a blood clot at the base of the brain. It was his opinion that she came to her death as a result of a brain hemorrhage. He further testified that a blow from a hand could have caused the injury, but "if you restrict that to the open hand, I would say it would be very unlikely." However, Dr. Lucke testified that a blow on the face administered by the hand or fist could have caused a hemorrhage of the brain. Both doctors testified that it would take about 12 hours for a blood clot to form.

There was testimony that the deceased was taken to the hospital the previous summer for acute appendicitis but no surgery was performed; that at about that time and at subsequent times she was subject to severe vomiting spells; and that she had suffered from dizzy spells.

"Courts do not and should not constitute themselves the arbiters of the household. There the authority of the parents, within the limits we shall presently define, is supreme and from their judgment there is no appeal. But these domestic tribunals ▮▮▮ have limits to their jurisdiction, beyond which they may not go with impunity. The welfare of the child is the principal ground on which the parental right to chastise him is founded and, where the punishment inflicted is so excessive and cruel as to show beyond a reasonable doubt that the parent was not acting in good faith for the benefit of the child but to satisfy his own evil passion, he no longer is to be considered as a judge administering the law of the household, but as a malefactor

guilty of an unlawful assault on a helpless person entrusted to his care and protection. Thus, to maim the child, or endanger his life or health, or to severely beat him with an improper and dangerous instrument, though no permanent injury be given, or to subject him to unusual forms of physical torture, or to whip him with such excessive severity as implies the absence of a due appreciation of parental duty, are acts which in themselves bespeak evil intent; and a parent guilty of such excess will not be heard to say that he thought he was acting for the benefit of the child. The existence of criminal intent will be presumed to have prompted the commission of the excessive act whether it resulted in permanent injury or disfigurement, or in temporarily subjecting its victim to merciless physical pain.'' State v. Koonse, 123 Mo. App. 655, l. c. 663, 101 S. W. 139.

A parent has the right to administer proper and reasonable chastisement to his child without being guilty of assault and battery, but if he administers unreasonable chastisement his act becomes unlawful. It is not the infliction of the punishment but the excess which constitutes the offense, and what this excess shall be is not a conclusion of law but a question of fact for the determination of the jury. And in making the determination of whether the punishment is moderate or excessive it must necessarily depend upon the age, sex, condition and disposition of the child with all the surrounding circumstances.

The corpus delicti consists of death of a human being and the criminal agency of another as a means thereof, and it may be proven by circumstantial evidence. State v. Bennett, 87 S. W. 2d 159; State v. Lyle, 353 Mo. 386, 182 S. W. 2d 530. Death of deceased is admitted in this case. The bruises on this girl's face, nose and chin would constitute assault and battery. The testimony of Dr. Lucke shows that these bruises could have been caused by the open hand or fist and that such blows could have caused the brain hemorrhage. It was this hemorrhage that caused deceased's death. Dr. Birney stated that the brain hemorrhage could have been caused by a blow from the hand but that it was very unlikely to have been caused by the open hand. There is at least circumstantial evidence from which the jury could have drawn its conclusion that deceased had been hit with the open hand or fist and even that her chin came in contact with the wall of the room, causing the injury wound on her chin. When we consider her age, the fact that she weighed only 108 pounds, her sickness at the time and her previous sickness, and that she was a female, we hold there was ample evidence that the jury could say the punishment was excessive.

Since there was evidence to show that the punishment was excessive, then the punishment constituted assault and battery. Therefore, the corpus delicti was proven.

"If one commits an unlawful assault and battery upon another without malice and death results, the assailant is guilty of manslaughter, although death was not intended and the assault was not of a character likely to result fatally." State v. Frazier, 339 Mo. 966, 98 S. W. 2d 707, l. c. 713.

The appellant admitted the slapping of the deceased upon her face, which we have already stated would justify the jury in finding the punishment was not corrective but excessive and, therefore, unlawful. We hold the evidence is sufficient for the jury to find that the defendant was guilty of culpable negligence in punishing the deceased and the evidence sufficient to find appellant guilty of manslaughter.

Appellant next contends that the court erred in permitting improper cross-examination of his wife, Vennie Mae Black.

On cross-examination the wife was asked if she was afraid of her husband or if she ever told anyone she was afraid of her husband. She was asked: "Do you recall, Mrs. Black, about December 11th last year, before Christmas, that you went to the hospital with a broken arm?" "Do you remember going to Dr. Birney's office December 11th, 1946, with a black eye and the same strained arm?"

Appellant objected to these questions as being highly improper, that he did not go into the subject on direct examination and that this witness was a privileged witness under the laws of this state.

The prosecuting attorney stated that this witness was asked in her direct examination "how her husband had treated her and these children and she said 'fine' and we have a right to show he didn't."

The trial court stated that "in view of the examination of this witness by Mr. Hamlin, the objection is overruled."

On direct examination this witness was not asked how appellant treated her. The testimony on this point is as follows:

"Q. Has he been kind and affectionate to these children?
A. Yes, sir, he has all his life.
Q. Was he kind and affectionate to Geneva [the deceased]?
A. Yes, sir, he loves his children.
Q. Did he love her?
A. Yes, sir, he did."

The above testimony clearly shows that this witness was not asked on direct examination how appellant treated her.

Section 4081, R. S. Mo., 1939, Mo. R. S. A., provides "* * * that no person on trial or examination, nor wife or husband of such person, shall be required to testify, but any such person may, at the option of the defendant, testify in his behalf, or on behalf of a co-defendant, and shall be liable to cross-examination, *as to any matter referred to in his examination in chief,* and may be contradicted and impeached as any other witness in the case * * *." (Italics ours.)

We think the record clearly shows that this wife was cross-examined on a subject not brought out in her examination in chief and under this

section such examination is clearly erroneous. She was not asked on direct examination how appellant treated her. Such questions were limited to how he treated their children.

We think this cross-examination was very prejudicial to the appellant. The average jury would get the impression that appellant was in the habit of beating the females in his family. If he did black the witness' eye, break her arm or strain it, he would be guilty of assault and battery upon his wife. He was on trial for excessive punishment of his deceased child. Therefore, under this record, we think the error is prejudicial and that the appellant did not have a fair trial.

The judgment of the trial court is reversed and remanded for a new trial. All concur.