# HOBART BOWERS *v.* STATE OF MARYLAND

[No. 150, September Term, 1977.]

*Decided July 13, 1978.*

116

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*Martha G. Villmoare, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Stephen B. Caplis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

We granted certiorari here to decide whether the State child abuse law, Maryland Code (1957, 1976 Repl. Vol.) Art. 27, § 35A, is so vague and indefinite as to violate the Due Process Clause of the Fourteenth Amendment to the Federal Constitution. After appellant's constitutional attack on the statute failed in the Circuit Court for Anne Arundel County (Evans, J.) and he was convicted by a jury of committing child abuse against his stepdaughter, he took an appeal to the Court of Special Appeals, which upheld the decision of the trial court in *Bowers v. State,* 38 Md. App. 21, 379 A. 2d 748 (1977).[1] We now affirm.

---

1. The same jury also found appellant guilty of raping his stepdaughter, but the trial court granted a new trial on this count and then accepted a guilty

The relevant facts are both undisputed and uncomplicated. Appellant began living with Betty Bowers in 1964. They were joined two years later by five-year old Patricia Evans, Betty's daughter by another man. One month before the trial of this case, which occurred in August 1976, appellant and Betty were married.

On February 25, 1976, Patricia, then 15 years of age, "played hookey" from school for part of the day. When she returned home that evening, Betty, having learned of her daughter's absence from school, struck Patricia on the legs several times with a belt.[2] According to Patricia, appellant then took the belt and began to beat her with it, striking her 15 to 20 times on the back, neck, arm and legs. She attended school on the next day, but a day later her vice-principal, during a conference concerning her truancy, observed her bruises and notified the Department of Social Services. An investigating officer found bruises on Patricia's neck, arm and back which he photographed at the police station. She was then taken to a hospital where she was given a tranquilizer and released.

Appellant, who had previously represented himself to a social worker as Betty's husband, testified that he had accepted Patricia as his own child, that he had provided for her and had been strict with her. He further testified that he had experienced "a lot of trouble" with Patricia in 1973 and that she had run away following another incident in which he had whipped her with a belt.

## I

Although the tragic phenomena of child abuse and neglect have plagued our society since its inception, Children's Bureau, U.S. Department of Health, Education & Welfare,

plea to the crime of carnal knowledge in lieu of the rape charge, which was consequently nolle prossed. None of the events surrounding these alleged crimes was related to the child abuse offense.

2. Betty Bowers, the natural mother, was also charged with child abuse and found guilty by the same jury. Her conviction, however, was reversed by the Court of Special Appeals because of insufficient evidence. Bowers v. State, 38 Md. App. 21, 30, 379 A. 2d 748 (1977).

*The Abused Child* 1 (1963), it was not until the late 1950's that research physicians throughout the country began to uncover evidence showing that the incidence and violence of parental attacks on children were far greater than anyone had ever anticipated. D. Gil, *Violence Against Children* 18 *et seq.* (1973). Spurred on by these shocking revelations and by a major clinical study prepared by a team of pediatricians in 1962, *see* Kempe, Silverman, Steele, Droegenmueller & Silver, *The Battered Child Syndrome,* 181 J. Am. Med. A. 17 (1962), legislatures in all fifty states rapidly adopted laws aimed directly at reducing the prevalence of physical mistreatment of children. Paulsen, Parker & Adelman, *Child Abuse Reporting Laws — Some Legislative History,* 34 Geo. Wash. L. Rev. 482 (1966). On the history of child abuse generally, see Fontana, *Somewhere a Child is Crying* 4 *et seq.* (1976).

Maryland's initial attempt at achieving a modicum of reform in this troubled area came in 1963 with the enactment of Chapter 743 of the Laws of 1963, then codified as § 11A of Article 27. That pioneering statute, entitled "Assault on Child," made it a felony for any "parent . . . or other person" having "permanent or temporary care or custody of a minor child" to maliciously beat, strike or mistreat the child to such a degree "as to require medical treatment." [3] Seeking to expand the relatively narrow scope of criminal liability

---

3. Ironically, at the time of its passage, Chapter 743 was already a rather outmoded response to the problem of child maltreatment. As early as the turn of the century, a significant number of states had enacted so-called "child cruelty" legislation similar to Chapter 743, in that they were predominantly penal statutes. Paulsen, *The Legal Framework for Child Protection,* 66 Colum. L. Rev. 679, 681-82 (1966). By the time the "battered child syndrome" had captured public attention in the early 1960's, it was generally agreed that the criminal law process was a grossly inadequate means of combatting child abuse, Paulsen, *supra,* 66 Colum. L. Rev. at 692-93; Delaney, *The Battered Child and the Law* in C. Kempe & R. Helfer, *Helping the Battered Child and his Family* 192 (1972), and that some sort of reporting system was minimally necessary. Paulsen, *Legal Protection against Child Abuse,* 13 Children 43, 46 (1966).

Although a reporting requirement was contained in the 1963 Maryland legislation as originally introduced (House Bill 922), this language was deleted for some reason prior to enactment of the bill. Reporting procedures were, however, adopted by Chapter 103 of the Laws of 1964 and substantially augmented two years later. Laws of 1966, ch. 221.

provided for in earlier legislation, the General Assembly amended the statute in 1973 to provide for the punishment of any parent or custodian who "causes abuse" to a child under the age of eighteen years. Laws of 1973, ch. 835; Art. 27, § 35A (a); *see State v. Fabritz,* 276 Md. 416, 423-24, 348 A. 2d 275 (1975), *cert. denied,* 425 U. S. 942 (1976). The term "abuse" was defined to be any:

> "physical injury or injuries sustained by a child as a result of *cruel* or *inhumane treatment* or as a result of malicious act or acts by any parent, adoptive parent or other person who has the permanent or *temporary care or custody* or responsibility for supervision of a minor child." Art. 27, § 35A (b) (7) (A) (emphasis added).[4]

For a discussion of the background of Maryland child abuse legislation, see Note, *Maryland Laws on Child Abuse — History, Analysis and Reform,* 6 U. Balt. L. Rev. 113, 116-18 (1976).

The sole ground asserted by appellant in this Court for reversal of his conviction is that the portion of the statute defining the felony of child abuse is so uncertain and indefinite as to deprive him of his right to due process of law under the Fourteenth Amendment. Appellant argues that the statute is unconstitutionally vague in two respects. First, he maintains that the use of the phrase "cruel or inhumane treatment" in Art. 27, § 35A (b) (7) (A) effectively reduces the language of the statute to such a state of uncertainty "that it fails to convey a definite warning as to the proscribed conduct measured by common understanding and practices." Secondly, he claims that the failure of the statute to include any definition of the phrase "temporary care or custody" creates a further ambiguity of constitutional dimension, since neither appellant nor others similarly situated would have had any way of knowing whether they fell within the class of persons subject to prosecution under the law. In our opinion, both of these contentions lack merit.

---

4. In 1974 the definition of abuse was extended to include "any sexual abuse of a child, whether physical injuries are sustained or not." Laws of 1974, ch. 554.

## II

From a long line of Supreme Court decisions, certain basic and universally accepted principles have emerged concerning application of the void-for-vagueness doctrine.[5] The cardinal requirement is that a penal statute "be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Connally v. General Const. Co.,* 269 U. S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926). "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Id.* The Fifth and Fourteenth Amendments guarantee that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey,* 306 U. S. 451, 453, 59 S. Ct. 618, 83 L. Ed. 888 (1939). *Accord, Hynes v. Mayor of Oradell,* 425 U. S. 610, 620, 96 S. Ct. 1755, 48 L.Ed.2d 243 (1976); *United States v. Mazurie,* 419 U. S. 544, 553, 95 S. Ct. 710, 42 L.Ed.2d 706 (1975); *Smith v. Goguen,* 415 U. S. 566, 572 n.8, 94 S. Ct. 1242, 39 L.Ed.2d 605 (1974); *Grayned v. City of Rockford,* 408 U. S. 104, 108, 92 S. Ct. 2294, 33 L.Ed.2d 222 (1972); *Bouie v. City of Columbia,* 378 U. S. 347, 350-51, 84 S. Ct. 1697, 12 L.Ed.2d 894 (1964); *United States v. Harriss,* 347 U. S. 612, 617, 74 S. Ct. 808, 98 L. Ed. 989 (1954); *Winters v. New York,* 333 U. S. 507, 515-16, 68 S. Ct. 665, 92 L. Ed. 840 (1948). *See generally* Note, *The Void-For-Vagueness Doctrine in the Supreme Court,* 109 U. Pa. L. Rev. 67 (1960).

In assessing the constitutionality of a statute assailed as overly uncertain either in respect of the acts it purports to prohibit or the persons to whom it applies, courts typically

---

5. In present day jurisprudence the void-for-vagueness principle is treated almost exclusively as a dictate of constitutional due process. Historically, however, the doctrine may well have had its origins in the practice of courts to refuse to enforce legislative enactments considered too indefinite to be fairly applied as a matter of common law. W. LaFave & A. Scott, *Handbook on Criminal Law* § 11, at 83 (1972); *see* Aigler, *Legislation in Vague or General Terms,* 21 Mich. L. Rev. 831 (1923).

consider two basic criteria. The first of these may be described as the fair notice principle and is grounded on the assumption that one should be free to choose between lawful and unlawful conduct. Due process commands that persons of ordinary intelligence and experience be afforded a reasonable opportunity to know what is prohibited, so that they may govern their behavior accordingly. This notion of fair warning does not presume that criminals frequently consult the statute books prior to embarking on an illicit course of action. Rather, as Mr. Justice Holmes explained in *McBoyle v. United States,* 283 U. S. 25, 27, 51 S. Ct. 340, 75 L. Ed. 816 (1931):

> "Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear."

Since "vague laws may trap the innocent by not providing fair warning," *Hynes v. Mayor of Oradell,* 425 U. S. at 622; *Grayned v. City of Rockford,* 408 U. S. at 108, no one should be subject to criminal responsibility for conduct which he could not reasonably understand to be prohibited. *Rose v. Locke,* 423 U. S. 48, 49, 96 S. Ct. 243, 46 L.Ed.2d 185 (1975); *United States v. Harriss,* 347 U. S. at 617; *Governor v. Exxon Corp.,* 279 Md. 410, 454, 370 A. 2d 1102, 372 A. 2d 237 (1977), *aff'd,* 437 U. S. 117, 98 S. Ct. 2207, 57 L.ED.2d 91 (1978).

A statute may also be stricken for vagueness if it fails to provide legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer the penal laws.

> "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory

application." *Grayned v. City of Rockford,* 408 U. S. at 108-109; *accord, Papachristou v. City of Jacksonville,* 405 U. S. 156, 170, 92 S. Ct. 839, 31 L.Ed.2d 110 (1972).

This is not to say, of course, that a criminal statute is void merely because it allows for the exercise of some discretion on the part of law enforcement and judicial officials. It is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it will be held unconstitutional under this second arm of the vagueness principle. *See Giaccio v. Pennsylvania,* 382 U. S. 399, 402-403, 86 S. Ct. 518, 15 L.Ed.2d 447 (1966).

As a general rule, the constitutionality of a statutory provision under attack on void-for-vagueness grounds must be determined strictly on the basis of the statute's application to the particular facts at hand. *United States v. Powell,* 423 U. S. 87, 92, 96 S. Ct. 316, 46 L.Ed.2d 228 (1975); *United States v. Mazurie,* 419 U. S. at 550; *United States v. National Dairy Corp.,* 372 U. S. 29, 32-33, 83 S. Ct. 594, 9 L.Ed.2d 561 (1963). Thus, it will usually be immaterial that the statute is of questionable applicability in foreseeable marginal situations, if a contested provision clearly applies to the conduct of the defendant in a specific case. *United States v. Petrillo,* 332 U. S. 1, 7, 67 S. Ct. 1538, 91 L. Ed. 1877 (1947).

A different rule governs, however, where the statute in question appears to intrude upon fundamental constitutional liberties, particularly the First Amendment guarantees of free speech and assembly. In such cases, not only may the two vices of inadequate notice and insufficient adjudicative guidelines be present, but in addition the indefiniteness of the statute itself may inhibit the exercise of protected freedoms. *Winters v. New York,* 333 U. S. at 509; *United States v. National Dairy Corp.,* 372 U. S. at 36.

> "[T]here is [in these cases] the danger that the state will get away with more inhibitory regulation than it has a constitutional right to impose, because persons at the fringes of amenability to regulation will rather obey than run the risk of erroneous

constitutional judgment." Note, 109 U. Pa. L. Rev. at 80.

On account of this "chilling effect" which vagueness can exert on First Amendment liberties, the Supreme Court has stated that whenever a criminal statute may, because of imprecise draftsmanship, impact upon free speech rights, the void-for-vagueness doctrine "demands a greater degree of specificity than in other contexts." *Smith v. Goguen,* 415 U. S. at 573; *accord, Hynes v. Mayor of Oradell,* 425 U. S. at 620; *cf. Coates v. City of Cincinnati,* 402 U. S. 611, 614, 91 S. Ct. 1686, 29 L.Ed.2d 214 (1971) (ordinance held unconstitutionally vague because it conditioned exercise of right of assembly upon unascertainable standard). Translated, this principle of strict specificity means that where First Amendment values are at least potentially involved, the statute is to be tested for vagueness *on its face. Smith v. Goguen,* 415 U. S. at 573; *Winters v. New York,* 333 U. S. at 509. So considered, the principle is essentially a rule of standing, permitting a defendant to challenge the validity of a statute as applied to marginal cases, even though the acts for which he has been charged may be squarely within the coverage of the statute. Note, 109 U. Pa. L. Rev. at 97. Once it is determined, however, that a strict specificity standard ought to apply in any given case, the criteria for measuring the validity of a statute under the vagueness doctrine are the same as in a non-First Amendment context: fair warning and adequate guidelines.

Although First Amendment interests are not implicated here, the matter of facial precision is not without significance in this case. Appellant argues that greater specificity is required "in the area of criminal child abuse statutes because of their potential for unwarranted intrusions on the constitutionally protected right of privacy in family relationships." While the Supreme Court has to date limited its "stricter specificity" test to those vagueness cases in which only First Amendment rights have been asserted, several state and lower federal courts have taken the position in the meantime that a more rigorous standard of vagueness review is triggered whenever an ill-defined penal statute is alleged to infringe upon *any* of the fundamental freedoms

protected under the Bill of Rights. *E.g., People v. Barksdale,* 8 Cal. 3d 320, 105 Cal. Rptr. 1, 503 P. 2d 257, 260 (1972) (privacy); *City of Lakewood v. Pillow,* 180 Colo. 20, 501 P. 2d 744, 745 (1972) (right to bear arms); *Alsager v. District Court of Polk Cty., Iowa,* 406 F. Supp. 10, 18-19 (S.D. Iowa 1975), *aff'd per curiam,* 545 F. 2d 1137 (8th Cir. 1976) (statute terminating parental rights for refusal to "give child necessary parental care and protection" or for "conduct . . . detrimental to the physical or mental health or morals of the child" held unconstitutionally void for vagueness); *see also* Day, *Termination of Parental Rights Statutes and the Void for Vagueness Doctrine: A Successful Attack on the Parens Patriae Rationale,* 16 J. Fam. L. 213, 217 (1978).

It remains to be seen whether the right of a parent to chastise his children by corporal punishment qualifies as a fundamental right for purposes of vagueness analysis. There are, though, strong indications that parents may well be entitled to some degree of constitutional protection in choosing the means by which to correct or influence the behavior of their offspring. *See Moore v. City of East Cleveland, Ohio,* 431 U. S. 494, 505, 97 S. Ct. 1932, 52 L.Ed.2d 531 (1977) ("decisions concerning child rearing [are] recognized as entitled to constitutional protection"); *Wisconsin v. Yoder,* 406 U. S. 205, 232, 92 S. Ct. 1526, 32 L.Ed.2d 15 (1972); *Stanley v. Illinois,* 405 U. S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972) ("the rights to conceive and to raise one's children have been deemed 'essential [and] basic civil rights of man' "); J. Nowak, R. Rotunda & J. Young, *Constitutional Law* 419 (1978) ("this [fundamental] right to privacy has been held to include the right to freedom of choice in . . . child rearing"); *see also Alsager v. District Court of Polk Cty., Iowa,* 406 F. Supp. at 16 (fundamental right of family integrity); *Roe v. Conn,* 417 F. Supp. 769, 777 (M.D. Ala. 1976); *Sims v. State Dep't of Public Welfare,* 438 F. Supp. 1179, 1190-91 (S.D. Tex. 1977).

For purposes of the present appeal, we need not decide whether a standard of strict facial precision must be applied whenever a vague statute bears on *any* fundamental constitutional right, nor need we determine whether the

parental privilege to engage in the physical discipline of children is such a right. Since we are of the view that the Maryland child abuse law survives scrutiny even under the more demanding test currently being invoked in First Amendment cases, we may assume without deciding that the stricter standard applies here.

## III

The thrust of appellant's constitutional attack is aimed at the definition of "abuse" in the Maryland statute. He argues that the term "cruel or inhumane" is so indefinite as not to comport with established standards of due process. We do not agree.

A statute is not vague when the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, if they possess a common and generally accepted meaning. *See Rose v. Locke,* 423 U. S. at 50. ("Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid"); *People v. Barksdale, supra,* 503 P. 2d at 262; *In Interest of Lewis,* 257 N.W.2d 505, 510 (Iowa 1977) (upholding parental rights termination provision of child neglect statute against vagueness challenge); *but cf. Lanzetta v. New Jersey,* 306 U. S. at 453-54 ("The meanings of that word [gang] indicated in dictionaries and in historical and sociological writings are numerous and varied").

Webster's Third New International Dictionary defines the word "cruel" as "disposed to inflict pain [especially] in a wanton, insensate, or vindictive manner: pleased by hurting others: sadistic." The word "inhuman," a variant of "inhumane," is defined by the same authority as "lacking the qualities of mercy, pity, kindness, or tenderness: cruel, barbarous, savage ...." Black's Law Dictionary (4th ed. 1968) defines the term "cruelty" as "the intentional and malicious infliction of physical suffering upon living creatures, particularly human beings; ... applied to the latter,

the wanton and unnecessary infliction of pain upon the body." *See Caffas v. Bd. of Sch. Dirs. of Upper Dauphin Area,* 23 Pa. Commw. Ct. 578, 353 A. 2d 898, 900 (1976). Clearly, then, the standard "cruel or inhumane" has a settled and commonly understood meaning. *See State v. Samter,* 4 Or. App. 349, 479 P. 2d 237, 239 (1971).

Additional support for this conclusion may be found amongst the common law rules regarding parental discipline of children. Long before the advent of contemporary child abuse legislation, it was a well-recognized precept of Anglo-American jurisprudence that the parent of a minor child or one standing in *loco parentis* was justified in using a reasonable amount of force upon a child for the purpose of safeguarding or promoting the child's welfare. *Boyd v. State,* 88 Ala. 169, 7 So. 268, 269 (1890); *R. v. Griffin,* 11 Cox. Cr. Cas. 402, 403 (Assizes 1869); W. LaFave & A. Scott, *Handbook on Criminal Law* § 52, at 389-90 (1972). So long as the chastisement was moderate and reasonable, in light of the age, condition and disposition of the child, and other surrounding circumstances, the parent or custodian would not incur criminal liability for assault and battery or a similar offense. *People v. Green,* 155 Mich. 524, 119 N. W. 1087, 1089-90 (1909); *State v. Black,* 360 Mo. 261, 227 S.W.2d 1006, 1010 (1950); Annot., 89 A.L.R.2d 396, 401-404 (1963) (collecting cases).

On the other hand, where corporal punishment was inflicted with "a malicious desire to cause pain" or where it amounted to "cruel and outrageous" treatment of the child, the chastisement was deemed unreasonable, thus defeating the parental privilege and subjecting the parent to penal sanctions in those circumstances where criminal liability would have existed absent the parent-child relationship. *Hinkle v. State,* 127 Ind. 490, 26 N. E. 777, 778 (1891); *see Neal v. State,* 54 Ga. 281, 282 (1875); Paulsen, *supra,* 66 Colum. L. Rev. at 686-87. Put another way, a parent was not permitted under the common law to resort to punishment which would exceed "that properly required for disciplinary purposes" or which would extend beyond the bounds of moderation. "Excessive or cruel" conduct was universally prohibited.

*Fabian v. State,* 235 Md. 306, 318-19, 201 A. 2d 511, *cert. denied,* 379 U. S. 869 (1964); *Moore v. State,* 15 Md. App. 396, 404-405, 291 A. 2d 73, *cert. denied,* 266 Md. 740 (1972); *Carpenter v. Commonwealth,* 186 Va. 851, 44 S.E.2d 419, 424 (1947).

In amending the child abuse statute in 1973 so as to include for the first time a definition of abuse, the General Assembly was well aware of the common law limitations on the parental privilege to impose discipline. Indeed, we have repeatedly held that the Legislature is presumed to have had full knowledge and information as to prior and existing law on the subject of a statute it has enacted. *Harden v. Mass Transit Adm.,* 277 Md. 399, 406-407, 354 A. 2d 817 (1976). By electing to restrict the criminal liability of parents under the statute only to those cases where the parent or custodian causes his child or ward to sustain physical injury as a result of cruel or inhumane treatment or as a result of other acts of malice, the Legislature apparently intended the definition of abuse to correspond to that type of conduct which would have sufficed to destroy the privilege to discipline at common law.

Thus, the terminology employed in Article 27, § 35A (b) (7) (A) appears to be nothing but a codification of the common law principles concerning the limits of permissible parental chastisement. Since the contours of the common law privilege have been subject for centuries to definition and refinement through careful and constant judicial decision-making, terms like "cruel or inhumane" and "malicious" have acquired a relatively widely accepted connotation in the law. The use of such phraseology in the child abuse statute would, therefore, not render the law constitutionally infirm. *See State v. Magaha,* 182 Md. 122, 131, 32 A. 2d 477 (1943) (upholding use of term "reasonable care" against vagueness attack); *and see State v. Cherry,* 224 Md. 144, 154, 167 A. 2d 328 (1961).

For these reasons, the Maryland child abuse law is sufficiently explicit to survive even strict scrutiny under the Due Process Clause. First, it meets the requirement of notice, such that persons of common intelligence need not guess at its meaning or speculate as to its application. If the underlying rationale of the fair notice requirement is that a

conviction should not result from conduct which cannot reasonably be understood as proscribed, that danger has been avoided here. Parents of ordinary intelligence are made aware that they do not subject themselves to the statute by merely engaging in corporal discipline for the purpose of punishment or correction. Only when the line is crossed and physical injury is intentionally and maliciously or cruelly inflicted does criminal responsibility attach. In short, the statute provides fair warning; it sets no trap for the unwary or innocent parent.

Similarly, the statute neither invites selective or discriminatory application by law enforcement authorities nor confers impermissible discretion upon judges and juries. The language of § 35A draws for the benefit of police officers, prosecutors and triers of fact reasonably clear lines between the kinds of parentally inflicted corporal punishment that are criminal and those that are not. Police, court and jury are precluded from reacting to nothing more than their own subjective ideas of child discipline.

Although several child abuse statutes from among the many enacted in this country have been challenged on grounds of vagueness, none has been struck down as unconstitutional. To be sure, none of these statutes employs language identical to that found in any of the others. Nevertheless, the terminology invoked to describe prohibited conduct in most such legislation is similar in effect to that found in the statute at issue in the case before us. *See, e.g., Campbell v. State,* 240 So. 2d 298 (Fla. 1970) ("Whoever tortures, torments, cruelly or unlawfully punishes, . . . or unnecessarily or excessively chastises"); *People v. Vandiver,* 51 Ill. 2d 525, 283 N.E.2d 681 (1971) ("willfully to cause or permit . . . the health of such child to be injured"); *Hunter v. State,* Ind., 360 N.E.2d 588 (1977) ("inflicting unnecessarily severe corporal punishment upon a child"); *State v. Fahy,* 201 Kan. 366, 440 P. 2d 566 (1968) ("Any person who shall torture, cruelly beat or abuse any child . . . or shall willfully inflict . . . any cruel or inhuman corporal punishment or injury resulting in a traumatic condition"); *State v. Samter,* supra, 479 P. 2d 237 ("who knowingly and willfully cruelly

mistreats and maltreats"); *State v. Killory,* 73 Wis. 2d 400, 243 N.W.2d 475 (1976) ("cruel maltreatment"); *and see People v. Hoehl,* Colo., 568 P. 2d 484 (1977). What these cases demonstrate is that a standard of absolute mathematical precision, however desirable in any statute whether penal or not, is neither reasonably attainable nor constitutionally mandated. As stated by Mr. Justice White in *Colten v. Kentucky,* 407 U. S. 104, 110, 92 S. Ct. 1953, 32 L.Ed.2d 584 (1972):

> "The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited."

It is true that terms such as "cruel or inhumane" and "cruel mistreatment" are by nature somewhat loose-fitting descriptions of human behavior. But in drafting a statute intended to deal with a problem as complex as child abuse, the Legislature is not required to spell out the prohibited acts in elaborate detail. To do so would likely be counterproductive. In our opinion, the definition of abuse challenged in the case at hand represents a most suitable compromise between the constitutionally mandated requirements of specificity and the practical need to devise language flexible enough to combat a social evil of truly inestimable proportions. *See* Freund, *The Use of Indefinite Terms in Statutes,* 30 Yale L. J. 437, 437-38 (1921).

## IV

Appellant contends finally that § 35A is vague and therefore constitutionally defective for the further reason that it fails to define adequately the class of persons to whom the statute applies. Not being a natural parent of the victim, but rather her stepfather, he seizes upon the term

"temporary care or custody" as being too indefinite to inform someone in his status that he comes within the ambit of the statute. Otherwise stated, no one in his position is capable of ascertaining whether the statute is aimed only at persons who have been awarded custody by judicial decree or includes also those who may simply be caring for a child in place of the parent. The answer to appellant's contention is found not so much in constitutional doctrine as it is in a proper interpretation of the statutory language in question.

We find persuasive the case of *State v. Smith,* 485 S.W.2d 461 (Mo. App. 1972), in which an issue arose much like that presented here. The defendant there was charged with mistreatment of his stepdaughter under a child abuse statute which subjected "any mother or father ... or any other person having the care and control of any [child]" to criminal prosecution. The contention there was that "care and control" meant, in effect, a court-awarded care and control, as distinguished from that status which prevails when one is in loco parentis with respect to a child. *See* Paulsen, *supra,* 66 Colum. L. Rev. at 682-83. The Missouri court reasoned that the disputed language was modified by the context in which it was used, namely, by the preceding words "mother or father"; thus the term "any other person having the care and control" referred to one in loco parentis to the child. We are likewise of the view that the Maryland General Assembly also intended that the statute here apply to persons who stood in that relationship to a child. Had the Legislature wished to narrow application of the child abuse law to those who had been awarded custody or control by court order, it could readily have done so in explicit language to that end. Here, appellant's own testimony amply established that he had assumed the "care or custody or responsibility for the supervision" of his stepdaughter, and thus stood in loco parentis with respect to her.

We hold, therefore, that the Maryland child abuse statute meets the requirement of definiteness imposed by the Due Process Clause of the Fourteenth Amendment.

*Judgment affirmed; costs to be paid by appellant.*