625 A.2d 416

David BRUCE

v.

STATE of Maryland.

No. 1679, Sept. Term, 1992.

Court of Special Appeals of Maryland.

June 4, 1993.

Adam Silverstein, Student Atty. (Jennifer P. Lyman, Assigned Public Defender, on the brief), Washington, DC, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued before FISCHER, DAVIS and MOTZ, JJ.

FISCHER, Judge.

David Bruce, the appellant, was convicted by a jury in the Circuit Court for Baltimore City of child abuse. Appellant subsequently filed a motion for new trial which the court denied. Thereafter, appellant was sentenced to eight years imprisonment, with four years suspended in favor of two years of probation commencing upon his release. Bruce appealed and raised three issues for our review:

1. Whether the trial court committed reversible error in concluding that [the] five year old [alleged victim] was competent to testify.

2. Whether the trial court improperly instructed the jury on the proper mental state required for child abuse.

3. Whether the trial court committed reversible error by admitting highly prejudicial hearsay, despite the prosecution's failure to comply with the mandatory twenty day

notice requirement of the Md.Cts. & Jud.Proc.Code Ann., § 9–103.1.

The pertinent facts unfolded on December 14, 1991 when the victim's mother, who was eight months pregnant, was taken to the hospital because she was believed to be in labor. Before the victim's mother departed for the hospital, however, the victim, who was then five years old, had been spanked by his great-uncle for punching holes in a toilet seat. The victim's mother testified that the spanking left no marks and that the child was healthy and had no injuries. Later that day, appellant picked up the child and stayed with him.

On December 16, while the victim's mother was still in the hospital, she spoke to appellant by telephone. Bruce told her that the boy had fallen down the stairs but was not "bruised up." The next day, Bruce took the boy to the hospital to see his mother. When the child arrived, his mother observed bruises and scabs across his face.

The victim's grandmother was also present at the hospital on that day, and when she attempted to inquire about the boy's injuries, Bruce intervened. The grandmother, then attempting to talk privately with the boy, tried to take the child into the bathroom. Bruce placed his foot against the bathroom door to prevent it from closing. He pushed open the door, swung at the grandmother, and said to the boy, "If you tell, I will kill you."

The child left the hospital with his grandmother, and on December 18, she took him to Johns Hopkins Hospital. Photographs taken at Hopkins depicted the child's injuries.

On May 1, 1992, the boy was again taken to Hopkins where he saw Dr. Lawrence Wissow, a pediatrician on the Child Advocacy Team. Two weeks later, Dr. Wissow again saw the victim at the Hopkins Pediatric Primary Care Clinic. These visits were for behavioral problems.

Dr. Wissow testified that, during the course of the visits, the boy stated that Bruce "had done the 'boo-boos' on his face." The child also disclosed that Bruce had hit him and had used a

brown belt to inflict many injuries. The victim further stated that Bruce had held his face under water in a bathtub and that Bruce choked him. In addition, the boy told Dr. Wissow that Bruce had warned that if the boy told anyone about the injuries, Bruce would hurt him. The boy also stated that Bruce would give him a G.I. Joe toy if he did not disclose the injuries.

The victim testified that the injuries to his face had been caused when Bruce hit him while wearing a ring. The boy also stated that he had sustained other injuries when Bruce hit him with a belt. The child further testified that Bruce had warned him not to discuss the injuries or Bruce would drown him. During cross examination, the victim stated that, when asked by his teacher about the injuries, he responded that he had fallen in the hall.

### I.

On appeal, Bruce first complains that the court erred in allowing the child to testify. According to Bruce, the boy "repeatedly told the trial judge he could not tell the difference between the truth and a lie." Bruce also contends that the judge "overlooked clear signs of adult influence" on the child's testimony and "failed to probe [the boy's] ability to remember and relate the events at issue...."

In support of his position, Bruce points to several exchanges that occurred during the competency hearing. That hearing consumed more than twenty-five pages of transcript; during it the circuit court carefully, indeed painstakingly, questioned the victim in order to determine his competency to testify. It is impossible to set out the entire transcript of the hearing here but we do set forth below a large and representative sample of the questions asked and answered during the hearing. After getting the child comfortably situated in court, the judge inquired whether the child knew the difference between a "good person" and a "bad person."

The Court: What's the difference? Do you know?

[The Victim]: No.

The Court: Do you know the difference between telling the truth or telling a lie?

[The Victim]: Yes.

The Court: What's the difference? Do you know the difference?

[The Victim]: No.

The Court: You don't know the difference between telling the truth and telling a lie?

[The Victim]: Yes.

The Court: All right. What's the difference between the truth or telling a non-truth or telling a lie? Do you know? What happens when you tell a lie?

[The Victim]: I get spankings.

The Court: You do? Who spanks you when you tell a lie? Do you know?

[The Victim]: (Nodding head.)

The Court: Who? Does your mommy spank you sometimes when you tell a lie?

[The Victim]: Yes.

The Court: Okay. Does anybody else ever spank you when you tell a lie?

[The Victim]: No.

The Court: Do you get spanked when you tell the truth?

[The Victim]: No.

The Court: Why?

[The Victim]: Because I tell the truth.

The Court: Because you told the truth. Is it good or bad to tell a lie?

[The Victim]: Bad.

The Court: Is it good or bad to tell the truth?

[The Victim]: The truth.

The Court: Is it good or bad to tell the truth?

[The Victim]: The truth.

The Court: The truth. Is it good or bad to tell the truth?

[The Victim]:  Bad to tell the truth.

.        .        .        .        .

The Court:  Is it good to tell a lie or bad to tell a lie?
[The Victim]:  Bad.
The Court:  Is it bad to tell the truth?
[The Victim]:  No.
The Court:  Is it good to tell the truth?
[The Victim]:  Yes.
The Court:  Do you get spanked when you tell the truth?
[The Victim]:  No.
The Court:  Do you get spanked when you tell lies?
[The Victim]:  Yes.
The Court:  Why do you get spanked when you tell a lie, but you don't get spanked when you tell the truth?  Do you know?
[The Victim]:  No.
The Court:  Has your mommy or grandmother ever told you to tell the truth or tell a lie?
[The Victim]:  No.
The Court:  Do they ever tell you to tell the truth?
[The Victim]:  No.
The Court:  Do they tell you to tell a lie?
[The Victim]:  No.
The Court:  Do you know when you're telling the truth?
[The Victim]:  Yes.
The Court:  Do you know when you're lying?
[The Victim]:  Yes.
The Court:  What's the difference?  How do you know when you're lying?  Do you know?
[The Victim]:  No.
The Court:  How do you know when you're telling the truth, do you know that?
[The Victim]:  (Shaking head.)

.        .        .        .        .

The Court: [W]hy are you here today?

[The Victim]: Because.

The Court: Why? Why are you here today?

[The Victim]: Because David Bruce beat me.

The Court: When did he do that? Do you know? Would you tell the truth or a lie about David Bruce?

[Defense Counsel]: Objection.

[The Victim]: The truth.

The Court: The truth. What would happen if you told a lie about David Bruce?

[Defense Counsel]: Objected to.

The Court: What would happen?

[Defense Counsel]: Objected to.

The Court: Mr. Hornstien, you may not—you may not mention a word under contempt of court. You may not even mention a word.

Now, I want you to tell me what would happen if you told a lie about David Bruce?

[The Victim]: He said he was going to drown me.

The Court: He would do what?

[The Victim]: He said he was going to drown [me] if I tell.

The Court: He told you he would drown [you] if you told what?

[The Victim]: Yes.

The Court: If you told what?

[The Victim]: That he beat me.

The Court: Okay. Would you come in court today and tell [the] truth or a lie about David Bruce.

[The Victim]: The truth.

The Court: And what would happen if you told a lie, if you didn't tell the truth about David Bruce?

[The Victim]: I'd get beatings.

The Court: Who would do that?

[The Victim]: Yes.

The Court:  Who would do that?

[The Victim]:  David Bruce.

The Court:  If you told a lie or the truth?

[The Victim]:  A lie.  If I told a lie.

The Court:  And what are you going to tell today, a lie or the truth?

[The Victim]:  The truth.

The Court:  Okay.  Do you want to ask him any questions?

.     .     .     .     .

[The Prosecutor]:  Okay.  [I]f I were to tell you that my shoes were white, would I be telling you the truth or a lie?

[Defense Counsel]:  Objected to.

[The Victim]:  A lie.

.     .     .     .     .

[The Prosecutor]:  And why wouldn't it be the truth?

[The Victim]:  Because it's black.

[The Prosecutor]:  What's black?

[The Victim]:  Your shoes.

[The Prosecutor]:  And if I were to tell you that my stockings were black, would that be the truth or a lie?

[The Victim]:  A lie.

[The Prosecutor]:  Why?

[The Victim]:  Because they're white.

[The Prosecutor]:  Okay.  For the record, my shoes are black, and my stockings are white.

[The Prosecutor]:  [I]f I were to tell you that I could fly, would that be the truth or a lie?

[The Victim]:  A lie.

[The Prosecutor]:  Why?

[The Victim]:  Because you can't.

[The Prosecutor]:  And If I were to tell you that I was wearing a watch, would that be the truth or a lie?

[The Victim]:  The truth.

[The Prosecutor]:  Why?

[The Victim]: Because you're wearing one.

[The Prosecutor]: For the record, the prosecutor is wearing a watch.

[The Prosecutor]: [I]f I were to tell you that this man's suit is blue, would that be the truth or a lie?

[The Victim]: A lie.

[The Prosecutor]: Why? Can you say why? What color is this suit?

[The Victim]: I don't know.

[The Prosecutor]: You don't know the name for that?

[The Victim]: No.

[The Prosecutor]: But is it black?

[The Victim]: No.

[The Prosecutor]: Is it blue?

[The Victim]: No.

[The Prosecutor]: For the record, no, no. Your Honor, for the record, I would describe it as white, but I guess it could be described as gray.

[The Prosecutor]: [W]ill you tell the truth today?

[The Victim]: Yes.

[The Prosecutor]: Will you promise us that you will tell the truth today?

[The Victim]: Yes.

.    .    .    .    .

The Court: What does it mean to tell a lie? Do you know? Do you know the difference between telling the truth or telling lie?

[The Victim]: No.

[The Prosecutor]: I'm going to object, Your Honor. I think those are questions that are difficult for philosophers to answer. I don't think that he can form the concepts necessary to answer.

.    .    .    .    .

The Court: Do you know what happens to people who tell lies?

[The Victim]: Yes.

The Court: What?

[The Victim]: They get beatings.

The Court: And what happens to people who tell the truth?

[The Victim]: They don't.

The Court: And why?

[The Victim]: Because they tell the truth.

The Court: And why do you tell the truth?

[The Victim]: So I won't get no beatings.

The Court: And do you know whether you are going to be asked to tell the truth or tell lies today?

[The Victim]: Tell the truth.

The Court: And are you going to tell the truth to everybody who questions you?

[The Victim]: Yes.

.    .    .    .    .

The Court: If [the prosecutor] told you to tell a lie, would you tell a lie?

[The Victim]: No.

The Court: Even if it made [the prosecutor] happy, would you tell a lie?

[The Victim]: No.

.    .    .    .    .

The Court: If [defense counsel] questioned you, would you tell [him] the truth or a lie?

[The Victim]: The truth.

The Court: And even if he wanted you to lie, would you lie?

[The Victim]: No.

The Court: And even if [the prosecutor] wanted you to lie, would you lie?

[The Victim]: No.

.    .    .    .    .

The Court: Okay. Let me, one more time then—if you are asked to swear to tell the truth today, do you know what that will mean?

[The Victim]: No, ma'am.

The Court: What will it mean? Do you know what it will mean to say, "I promise to tell the truth?"

[The Victim]: No, ma'am.

The Court: Do you know what it means to promise to tell the truth?

[The Victim]: No.

The Court: Do you know what it means—would you tell the truth if someone asked you a question?

[The Victim]: Yes.

The Court: Would you tell a lie if someone asked you a question?

[The Victim]: No.

The Court: All right. I think I've asked him all I need.

■ Appellant contends that, throughout the competency hearing, the child demonstrated an inability to understand the truth, an inability to understand the nature of an oath, and a suggestability to adult influences. Our reading of the transcript, however, belies this assertion. Although the victim did give a handful of "wrong" answers, it seems to us that, on balance, his testimony supports the lower court's conclusion that the victim was competent to testify.

In Jones v. State, 68 Md.App. 162, 165, 510 A.2d 1091 (1986), we opined:

Because the trial judge has the opportunity to observe the potential witness's conduct and demeanor during *voir dire*, the determination of whether a child is competent to testify is left to the sound discretion of the trial court. Absent an abuse of that discretion, the court's judgment will not be disturbed. [Citations omitted.]

We further stated:

In essence, the test of a child's competency is not age but the reasonable capacity to observe, understand, recall and relate happenings while conscious of a duty to speak the truth.

*Jones,* 68 Md.App. at 166–167, 510 A.2d 1091 (citations omitted).

Unlike the record in *Jones,* the record in the case *sub judice* demonstrates that the victim understood and appreciated the importance of telling the truth. In *Jones,* the *voir dire* examination was very brief and consisted entirely of leading questions. The child in *Jones* voiced an answer to just two questions, and those answers were wholly unresponsive to the questions asked. With regard to other questions, the child "answered" by nodding her head or, in several instances, failed to indicate *any* type of response. Thus, we concluded that the *voir dire* in *Jones:*

demonstrated [the child's] total inability to understand basic questions. Her answers exhibited confusion and were riddled with inconsistencies. [The child] displayed an inability to communicate in any meaningful manner. She failed to exhibit an understanding or an appreciation of her obligation to tell the truth or, indeed, its very meaning.

*Jones,* 68 Md.App. at 167–168, 510 A.2d 1091.

By contrast, the victim in the case currently before us was able to articulate, in a manner appropriate for his age, the difference between the truth and a lie. He was also able to demonstrate, during a lengthy *voir dire* examination, that he appreciated the importance of telling the truth. Further, he indicated that he would not tell a lie even if asked to do so by the prosecutor.

We do not, of course, evaluate the child's responses as we would those of an adult. The child would certainly fail to meet such a standard. Undeniably, there were points during the *voir dire* questioning that the child struggled with his responses. We attribute that difficulty not to the child's incompetency, but to the form of the questions asked of him. When the questions were posed at a level appropriate for a five-year old,

the child was able to respond clearly and without hesitation. His responses demonstrated that he was able to distinguish between the truth and a lie, that he was intent on telling the truth, and that he was unwilling to tell a lie even at the behest of adults. Under these circumstances, the trial court did not abuse its discretion in allowing the victim to testify.

## II.

Appellant's next assignment of error concerns the instructions given to the jury on the child abuse charge. Appellant was convicted of child abuse as defined in Art. 27, § 35A(a)(2)(i), which provides in pertinent part:

'Abuse' means:

The sustaining of physical injury by a child as a result of cruel or inhumane treatment or as a result of a malicious act by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member, under circumstances that indicate that the child's health or welfare is harmed or threatened thereby....

With regard to this charge, the court instructed the jury:

Child abuse is a physical abuse of a child under eighteen by a parent or other person who has permanent or temporary care, custody, or responsibility for supervision of the child.

In order to convict the defendant of child abuse, the State must prove; one, that the defendant, as a household member, had permanent or temporary care, custody, or responsibility for the supervision of [the child]; and two, that [the child] was at that time under eighteen years of age; and three, that the defendant caused physical injury as a result of cruel or inhumane treatment or a malicious act; and four, that the child's health or welfare was harmed or threatened by the injury.

Cruel or inhumane treatment or a malicious act means conduct or force beyond that which is reasonable or appro-

priate for the child when considering all the surrounding circumstances.

At the close of instruction, the prosecutor asked for clarification that the household member need not have permanent or temporary care of the child—that the perpetrator must be either a parent, a permanent or temporary caretaker, or a household member. Defense counsel then asked for clarification of the *mens rea* required for the offense. Defense counsel argued that a "willful and malicious desire" was necessary to the crime and that actual malice refers to "an evil state of mind."

In response to these objections, the court re-instructed the jury as follows:

Child abuse is physical abuse of a child under eighteen by a parent or other person who has permanent or temporary care, custody or, responsibility for the supervision of that child or who is a household member where the child resides.

In order to convict the defendant of child abuse, the State must prove; one, that the defendant had the permanent or temporary care, custody, or the responsibility of the supervision of the child or was a household member; and two, that the child ... was at the time under eighteen years of age; three, that the defendant caused physical injury as a result of cruel or inhumane treatment or a malicious act; and four, that the child's health or welfare was harmed or threatened by the injury.

Cruel or inhumane treatment or a malicious act means contact or force beyond that which is reasonable or appropriate for the child.

When considering all of the surrounding circumstances, the defendant must have intended in inflicting the physical injury as a result of cruel or inhumane treatment, his actions. In other words, he must have intended what he did.

Defense counsel again excepted on the basis that the intention must be "malicious and evil." The court denied the exception, and the appellant now contends that the court's

decision was erroneous. Appellant argues that the instruction "permitted the jury to convict based on general intent to do the acts that caused the injury, where the statute requires a cruel, inhumane, or malicious state of mind, in short, an intent to inflict pain."

We first note that the instruction given by the court was nearly a verbatim recitation of the Maryland Criminal Pattern Jury Instruction 4:07. The only variations were the court's addition of the phrase "or household member" and the explanation that the defendant must have intended to inflict injury as a result of cruel or inhumane actions.

In *Bowers v. State*, 283 Md. 115, 127, 389 A.2d 341 (1978), the Court of Appeals noted that the child abuse statute limited criminal liability "to those cases where the parent or custodian causes his child or ward to sustain physical injury as a result of cruel or inhumane treatment or as a result of other acts of malice. . . ." Moreover, "Only when the line is crossed and physical injury is intentionally and maliciously or cruelly inflicted does criminal liability attach." *Bowers*, 283 Md. at 128, 389 A.2d 341.

The court instructed the jury that the defendant must have intended to inflict the physical injury as a result of cruel or inhumane treatment. This is a correct statement of the law, and we perceive no error in the denial of appellant's exceptions.

### III.

Appellant's third allegation of error concerns the State's use of hearsay testimony from Dr. Wissow. Appellant complains that he received only nineteen days notice of the State's intention to use hearsay testimony. Section 9–103.1 of the Cts. & .Jud.Proc.Code Ann. provides an exception to the hearsay rule and allows, in cases such as this, the admission into evidence of out of court statements made by the victim. The statements must have been made to and be offered by a licensed physician, a licensed psychologist, a licensed social worker, or a teacher. In order to provide the defendant with

an opportunity to prepare a response to the statements, the prosecutor shall supply the defendant and the defendant's attorney with notice of the State's intention to introduce the statements and of the content of the statements. Such notice shall be provided at least twenty days prior to the criminal proceeding. § 9–103.1(c)(3). Appellant contends that, because he received only nineteen days notice, the State should have been prohibited from introducing the statements at trial.

The circuit court ruled that, since the purpose of the statute is to provide the defendant with an opportunity to prepare a response and since Dr. Wissow was not expected to testify until twenty-two days after the appellant received notice, the appellant had sufficient time to prepare a response to the hearsay statements. The appellant now claims that the twenty day requirement is a condition precedent to admission of the testimony and that the court erred in looking to the purpose of § 9–103.1 to resolve this issue.

While it is true that the word "shall" ordinarily implies a mandatory directive, it is equally true that where a statement or rule contains mandatory language but fails to provide a sanction for noncompliance, the Court of Appeals has looked to the purpose of the provision in order to determine an appropriate sanction. *In re Keith W.*, 310 Md. 99, 104, 527 A.2d 35 (1987). In *In re Keith W.*, for example, the Court declined to dismiss the case even though the State had failed to comply with a "mandatory" time requirement. The Court considered the overriding goal of Maryland's legislation concerning juveniles and concluded that dismissal would thwart the purpose of the statutory scheme. *In re Keith W.*, 310 Md. at 106–107, 527 A.2d 35.

So, too, in the current case did the trial court consider the express purpose of § 9–103.1 and determine that the defendant had been afforded an adequate opportunity to prepare a response to the proposed hearsay testimony. We perceive no error in the decision of the circuit court.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.