*Wicomico County Department of Social Services v. B.A.*
No. 46, September 2014 Term

**Child Abuse and Neglect – Sexual Abuse – Temporary Care or Custody or Responsibility for the Supervision of a Child.** An individual may be found to be responsible for "indicated" child sexual abuse by a local department of social services if the individual commits an act involving sexual molestation or exploitation of the child while the individual has "temporary care or custody or responsibility for the supervision of a child." There was substantial evidence to support an administrative law judge's conclusion that a martial arts instructor did not have "temporary care or custody or responsibility for the supervision of a child" when the instructor engaged in sexually suggestive electronic and telephone communications with a 15-year old student outside of classroom hours while the student was at home, and no inappropriate behavior occurred while the student was in class or in the instructor's presence. Maryland Code, Family Law Article, §5-701(x).

Circuit Court for Wicomico County
Case No. 22-C-12-001286
Argued: June 3, 2015
Reargued: December 3, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 46

September Term, 2014

---

WICOMICO COUNTY
DEPARTMENT OF SOCIAL SERVICES

v.

B.A.

---

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts,
Harrell, Glenn T., Jr. (Retired,
Specially Assigned)

JJ.

---

Opinion by McDonald, J.
Adkins, Watts, and Harrell, JJ., dissent.

---

Filed: July 12, 2016

---

*Battaglia, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being
recalled pursuant to the Constitution, Article IV,
Section 3A, she also participated in the decision
and adoption of this opinion.

Under the State's Child Abuse and Neglect Law, local departments of social services are charged, along with law enforcement, with investigating allegations of child abuse. At the conclusion of an investigation, the department is to determine whether child abuse is "indicated," "ruled out," or "unsubstantiated." The department may make a finding of indicated child sexual abuse if, among other things, an individual commits an act of sexual exploitation or molestation against the child while the individual has "temporary care or custody or responsibility for the supervision of the child."

In this case, the Respondent, a martial arts instructor, engaged in sexually explicit communications by email and telephone with a 15-year old student who regularly attended his class. All of this inappropriate behavior occurred outside of class while the instructor and student were in separate locations, usually their respective homes. Petitioner Wicomico County Department of Social Services found that the instructor had engaged in child sexual abuse under the statute. Following a hearing, an administrative law judge ("ALJ") concluded that this finding should be reversed because the instructor did not have "care or custody or responsibility for the supervision of" the student when she was not in his class and there was no evidence of inappropriate behavior on the instructor's part while the student was in the instructor's presence – a decision that the Circuit Court for Wicomico County and Court of Special Appeals affirmed on judicial review.

On the record before us, there was substantial evidence to support the decision of the ALJ and the lower courts. The instructor's out-of-class behavior was clearly inappropriate and may have violated some other statute, but it did not constitute child sexual abuse under the current statutory definition.

# I

# Background

## A.      *Statutory Framework*

The law defining child sexual abuse and governing the investigation of allegations of such abuse is set forth in in Maryland Code, Family Law Article ("FL"), §5-701 *et seq.*, and in regulations adopted by the Department of Human Resources pursuant to the statute. Under the statute, "abuse" includes "sexual abuse of a child." FL §5-701(b)(2). "Sexual abuse" is defined, in pertinent part, as "any act that involves sexual molestation or exploitation of a child by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child ...." FL §5-701(x)(1).[1]  Examples of

---

[1] The Department's regulations include a similar definition of child abuse in which the term "caretaker" is substituted for the statutory phrase "other person who has permanent or temporary care or custody or responsibility for supervision of a child." COMAR 07.02.07.02B(7).  The regulations define "caretaker" somewhat more broadly than the phrase that it replaces:

> (4)     Caretaker.
>
> (a)      "Caretaker" means an individual who has, *or is known to a child through having had,* permanent or temporary care, custody, or responsibility for supervision of the child.
>
> (b)      "Caretaker" includes, but is not limited to, a stepparent, foster parent, guardian, custodian, or employee or volunteer in a facility or program caring for a child.

COMAR 07.02.07.02B(4) (emphasis added).  This elaboration of the statutory definition was a matter of debate before the ALJ and courts below, although it is not at issue before us and the Department has disclaimed reliance upon it.  *See* footnote 5 below.

acts that involve sexual molestation or exploitation of a child, such as human trafficking or rape, follow in the next statutory provision. FL §5-701(x)(2). This list is not exhaustive. *See Crispino v. State*, 417 Md. 31, 44-46, 7 A.3d 1092 (2010). The Department's regulations elaborate that "sexual molestation or exploitation" means "sexual contact or conduct with a child" and includes a list of examples. The pertinent regulation provides:

Sexual Molestation or Exploitation.

(a) "Sexual molestation or exploitation" means sexual contact or conduct with a child.

(b) "Sexual molestation or exploitation" includes, but is not limited to:

(i) Exposure, voyeurism, sexual advances, kissing, or fondling;

(ii) Sexual crime in any degree including rape, sodomy, or prostitution;

(iii) Allowing, encouraging, or engaging in obscene or pornographic display, photographing, filming, or depiction of a child in a manner prohibited by law; or

(iv) Human trafficking.

COMAR 07.02.07.02B(42).

When a local department of social services receives a report of child abuse, it (or appropriate law enforcement agency, or both) must investigate. FL §5-706(b). Possible civil outcomes of the investigation are: (1) abuse is "indicated," meaning "a finding that there is credible evidence, which has not been satisfactorily refuted, that abuse, neglect, or sexual abuse did occur"; (2) abuse is "ruled out," meaning "a finding that abuse, neglect, or sexual abuse did not occur"; or (3) abuse is "unsubstantiated," meaning "a finding that

3

there is an insufficient amount of evidence to support a finding of indicated or ruled out."

FL §5-701(m), (w), (y). The Department's regulations elaborate on the evidence – or lack thereof – that supports each of those findings. *See* COMAR 07.02.07.12.

When the local department makes a finding of "indicated" or "unsubstantiated," the department must inform the individual alleged to have abused the child of the finding, and the individual may request a contested case hearing under the State Administrative Procedure Act ("APA"), Maryland Code, State Government Article ("SG"), §10-201 *et seq*. *See* FL §5-706.1; COMAR 07.02.26. The ALJ may uphold the local department's finding or modify it. COMAR 07.02.26.14. The individual or local department may seek judicial review of the ALJ's decision in accordance with the APA. SG §10-222; COMAR 07.02.26.14F.

Under this statute, the local department keeps records of individuals who have been found responsible for "indicated" child abuse, or for "unsubstantiated" child abuse for a specified period of time, but no further consequences necessarily follow. *See* FL §§5-707, 5-714.

The definitions of child abuse in the Family Law Article are similar to those that appear in the statute that creates criminal liability for child neglect and abuse. *See* Maryland Code, Criminal Law Article ("CR"), §3-601 *et seq*. For example, criminal child abuse, which can be in the first or second degree depending on its severity, is abuse committed by a "parent, family member, household member, or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor." CR §3-601(b)(1), (d)(1). This criminal provision thus uses the same phrase as the civil

4

provision in the Family Law Article: a "person who has permanent or temporary care or custody or responsibility for the supervision of a minor." This is unsurprising, as the civil and criminal provisions originated as parts of the same statute with the same set of definitions.[2]

**B.    Facts**

The pertinent facts, as they appear in the administrative record, are uncontested.[3]

---

[2] The civil and criminal provisions relating to child abuse were originally enacted as part of the same statute and codified in former Article 27 of the Maryland Code. Chapter 221, Laws of Maryland 1966, *then codified in* Maryland Code, Article 27, §11A. That law specified civil and criminal consequences for the same conduct. It was later recodified as Article 27, §35A. Chapter 500, Laws of Maryland 1970. A definition of "abuse" was added to the statute in 1973. Chapter 835, Laws of Maryland 1973. A definition of "sexual abuse" was added the following year. Chapter 554, Laws of Maryland 1974. The civil and criminal consequences thus related to conduct based on the same definitions.

In 1984, as part of the creation of the Family Law Article, the civil provisions were moved to the new Family Law Article. Chapter 296, Laws of Maryland 1984. Identical versions of the pertinent original definitions in Article 27 were included with the civil provisions in the Family Law Article and were also retained with the criminal provisions in Article 27. The criminal provisions were later recodified as part of the new Criminal Law Article. Chapter 26, Laws of Maryland 2002. The provision concerning child sexual abuse in both the Family Law Article and the Criminal Law Article both continue to describe conduct by a "person who has permanent or temporary care or custody or responsibility for the supervision of" a child. *See* CR §3-602(b); FL §5-701(x).

[3] The evidence at the administrative hearing in this case consisted of the testimony of Ms. K., her boyfriend, the investigating police officer, and the representative of the local department who received and investigated the complaint. The Department's investigative file, consisting largely of interview reports and a few emails retrieved from Ms. K.'s phone, was admitted in evidence, along with a video recording of the interviews of Ms. K. and her boyfriend. Although Mr. A. did not stipulate to the facts, he elected not to testify at the hearing and, in this civil context, one may infer, as the ALJ apparently did, that the events recounted by Ms. K. and the other witnesses are true.

Respondent B. A.[4] is an instructor at a martial arts school in Salisbury. He has been a friend of the family of V. K., since before Ms. K.'s birth in 1995. Ms. K. took martial arts instruction from Mr. A. as a small child and, after a break, resumed taking classes with him regularly in October 2010 when she was 15 years old. During these classes, according to Ms. K., Mr. A. was "really friendly" to Ms. K. She testified that Mr. A. "spen[t] more time with [her] than with everybody else," and he spoke with her after class about her "personal life" and "how [she] was doing." He referred to her as "Sunlight," a pet name that only he used for her.

In November 2010, Ms. K. missed class due to illness, and Mr. A. texted her to ask how she was doing. He added that the class missed her and that he hoped that she felt better. After this, the two of them continued to exchange texts, at first occasionally but over time with increasing frequency. Around February 2011, they also began to exchange emails. They created email addresses that did not identify themselves by name and that they used to communicate only with each other. Ms. K.'s 18-year old boyfriend, D. P., also had access to Ms. K.'s account.

Around February and March 2011, their conversations turned increasingly to sexual topics. By email, Mr. A. sent Ms. K. pictures of erotically posed women and told her that he would like her to pose for pictures, but she declined to do so. Ms. K. testified that she and Mr. A. had several telephone calls, including one in which he said that he wanted to

[4] The Court of Special Appeals granted a motion to refer to B. A. by his initials. We also use initials to refer to certain other individuals to protect their privacy.

6

teach her a martial arts kick in class that would cause her to lift her leg onto a railing so that he could "slyly touch [her] vagina." In telephone calls and in emails, he told her that he existed on a spiritual plane and that if she "felt anything," he was having sex with her on the spiritual plane. In another telephone call, which Ms. K. said lasted approximately five hours, Mr. A. said that he was "hard" and that he wanted to have sex with her. She testified that they spoke again by telephone the next morning and he told her that he was touching himself. On several occasions, he invited her over to his house, nominally to "work off" the price of her gi (a martial arts uniform) by helping him with gardening or other chores, but she declined to go. During February and March 2011, Mr. A. expressed concern that others would not understand their relationship and that Ms. K. should delete the messages that he sent to her.

According to Ms. K., they continued to correspond in much the same vein until May 2011. Around May 19, 2011, Ms. K. showed her boyfriend a message from Mr. A. that said that the boyfriend was not good enough for Ms. K. About two weeks later, the boyfriend confronted Mr. A. in his office at his martial arts studio, with Ms. K. present. According to the boyfriend, Mr. A. alternately apologized for, attempted to excuse, and denied the inappropriate communications with Ms. K. After that confrontation, Mr. A. continued to communicate with Ms. K. outside of class, but he did so with declining frequency and without sexual content. At some point in 2011, Ms. K. attempted to switch out of Mr. A.'s class and by November, she was no longer in his class.

The ALJ found that none of the sexually inappropriate conduct occurred during class. In class, Mr. A. did not touch or speak to Ms. K. in a sexual manner. She reported

7

that he touched her hips with his hands at least once to help her with a position, but did no more.

## C.     *Procedural History*

*Investigation and Finding*

On November 3, 2011, the Wicomico County Department of Social Services ("Department") received a report that Mr. A. had sent Ms. K. sexually explicit text messages and emails. On November 4, 2011, Amy Giordano, an experienced investigator for the Department, conducted recorded interviews with Ms. K. and her boyfriend about the allegations. Detective John Seichepine assisted in the investigation and obtained copies of some of the email exchanges between Mr. A. and Ms. K. and copies of their telephone records. Through his attorney, Mr. A. declined to be interviewed by the investigators. On January 6, 2012, after completion of the investigation, the Department, through Ms. Giordano, found Mr. A. responsible for indicated child sexual abuse based on the out-of-class communications.

*Administrative Hearing*

Mr. A. requested a hearing. On June 12, 2012, the ALJ held a contested case hearing. At the hearing, Mr. A.'s attorney argued that nothing inappropriate occurred while Ms. K. was under the care of Mr. A. at the martial arts school and that the sexually explicit communications recounted by Ms. K. occurred by telephone or electronically during off-hours when she was in her own home. The Department's representative conceded that

8

there was no actual sexual contact, but argued that the abuse lay in Mr. A.'s "grooming" of Ms. K. during the period he was her instructor.[5]

The ALJ issued a decision on July 20, 2012. The ALJ found that it was undisputed that Mr. A. had inappropriate "sexually exploitive" communications with Ms. K. However, the ALJ noted that there was a clear temporal break between the instructor-student relationship of Mr. A. and Ms. K. at the martial arts studio and the inappropriate sexually explicit communications that took place when they were not physically together. Accordingly, the ALJ concluded, Mr. A. did not have care or custody or responsibility for the supervision of Ms. K. at the time of the sexually exploitative conduct and thus did not commit abuse under FL §5-701(x). Pursuant to COMAR 07.02.26.14D, the ALJ ordered the Department to modify the finding of "indicated" abuse to "ruled out."[6]

---

[5] This "grooming" theory was not articulated in any detail at the administrative hearing, but the Department has elaborated on it in later court filings. *See* footnote 10 below.

At the administrative hearing, the Department also argued that Mr. A. was a "caretaker" of Ms. K. under COMAR 07.02.07.02B(4)(a) and (b). *See* footnote 1 above. The ALJ concluded that this regulation was excessively vague and improperly extended the definitions in FL §5-701(x) to individuals who did not have contemporaneous care, custody, or responsibility for the supervision of a child. The ALJ consequently declined to apply the definition of "caretaker" in COMAR. After the Circuit Court and the Court of Special Appeals agreed with the ALJ that this regulation exceeded the reach of the statute, the Department abandoned its reliance on the regulation in this Court, so we do not consider it.

[6] That regulation authorizes an ALJ, after a hearing, to order a local department to modify a finding of child abuse.

*Judicial Review*

The Department filed a petition for judicial review in the Circuit Court for Wicomico County. On December 21, 2012, the Circuit Court held oral argument, and on March 22, 2013, it affirmed the decision of the ALJ. The Department appealed to the Court of Special Appeals, which also affirmed the ALJ in an unreported opinion.

The Department then filed a petition for a writ of *certiorari* with this Court, which we granted. The issue presented by the Department in its petition was whether the Department's original finding could be supported by "grooming" behavior by Mr. A. during class – when Mr. A. had responsibility for the supervision of Ms. K. – in conjunction with the out-of-class communications.

Following briefing and oral argument on that issue, we requested supplemental briefing on three questions:

> 1.    In an ongoing instructor-student relationship, can "temporary care or custody or responsibility for supervision of a child" pursuant to FL §5-701(x)(1) be established through remote electronic communications?
>
> 2.    Can "temporary care" pursuant to FL §5-701(x)(1) be established without the mutual consent, expressed or implied, of the one legally charged with the care of the child and of the one purportedly assuming the "temporary care"?
>
> 3.    Does an instructor who has temporary care or responsibility for a child on a repeated, ongoing basis, commit child abuse within the meaning of FL §5-701 by sexually explicit communications made via texts, telephone calls or other electronic means to the child, provided there exists a significant connection between the abusive conduct and the in-person care or responsibility?

The parties filed supplemental briefs and additional oral argument was held on those questions.

## II

## Discussion

### A. *Standard of Review*

"When reviewing the decision of an administrative agency … we review the agency's decision directly, not the decision of the circuit court [or the intermediate appellate court]." *Comptroller v. Science Applications Int'l Corp.*, 405 Md. 185, 192, 950 A.2d 766 (2008). Whether conduct permits a finding of indicated child abuse is a mixed question of law and fact, and we affirm the ALJ's decision unless it is unsupported by competent, material, and substantial evidence in light of the entire record as submitted. *Charles County Dep't of Soc. Servs. v. Vann*, 382 Md. 286, 295-96, 855 A.2d 313 (2004). We afford no special deference, however, to the interpretation of the ALJ on matters of law. 382 Md. at 295.

### B. *Sexually Exploitative Conduct with a Child*

Our task is to review the ALJ's determination that child sexual abuse should be "ruled out" in this case. As indicated above, child sexual abuse means "any act that involves sexual molestation or exploitation of a child by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member." FL §5-701(x)(1). There appears to be no question that Mr. A. engaged in sexually exploitative conduct with a child – *i.e.,* an individual under the

11

age of 18.[7] Ms. K. was 15 years old at the time of most of the communications and turned 16 part way through the relevant time period. Mr. A. appears to have committed at least one act enumerated in the definition of "sexual abuse," namely encouraging a child to engage in obscene or pornographic photography or poses. *See* FL §5-701(x)(2)(i); COMAR 07.02.07.02B(42)(b)(iii). Other out-of-class communications between Mr. A. and Ms. K. could also be characterized as sexually exploitative. *Cf. Walker v. State*, 432 Md. 587, 625, 69 A.3d 1066 (2013) (an adult who passed notes to a child in class exploited her sexually because "the context and the content" of the notes was sexual and the adult "received a benefit" − sexual or romantic pleasure − from the notes).

## C.     *Caretaker Status*

The remaining question is whether Mr. A. fell within the class of persons covered by the statute at the time of his inappropriate behavior – *i.e.,* whether he was a parent, household or family member, or "other person who has permanent or temporary care or custody or responsibility for the supervision of a child." FL §5-701(x)(1). He was not Ms. K.'s parent, nor was he a household or family member, nor did he have any permanent responsibility for her. Therefore, the only possibility is that he was an "other person who has … temporary care or custody or responsibility for supervision of" Ms. K. It appears to be undisputed that he did have temporary responsibility for the supervision of Ms. K. during the time that she was in his martial arts class. However, the key question is whether

---

[7] FL §5-701(e).

he had such status in relation to Ms. K. at the time he engaged in sexually exploitative conduct.  The ALJ concluded that he did not – a conclusion affirmed by the courts below.

*Caretaker Status and Temporal Breaks*

The resolution of this case depends to some extent on the construction of the pertinent statutory language – *i.e.,* what it means to have "temporary care or custody or responsibility for the supervision of" a child.  As always, we look to the "normal, plain meaning of the language of the statute."  *Lockshin v. Semsker*, 412 Md. 257, 275, 987 A.2d 18 (2010).  The statute refers to an "act ... by a ... person who *has* ... temporary care or custody or responsibility for the supervision of a child."  FL §5-701(x)(1) (emphasis added).  The present tense indicates that the act must take place *while* the person has temporary care or custody or responsibility for supervision.

This Court has previously said that "temporary care or custody" is equivalent to "*in loco parentis*," a relatively restrictive classification that "arises only when one is willing to assume all the obligations and to receive all the benefits associated with one standing as a natural parent to a child."  *Pope v. State*, 284 Md. 309, 323, 396 A.2d 1054 (1979) (quoting *Fuller v. Fuller*, 247 A.2d 767 (D.C. 1968)).  However, "responsibility for ... supervision" is broader.  As the Court in *Pope* observed:

> "Responsibility" in its common and generally accepted meaning denotes "accountability," and "supervision" emphasizes broad authority to oversee with the powers of direction and decision. . . .  Absent a court order or award by some appropriate proceeding pursuant to statutory authority, we think it to be self-evident that responsibility for supervision of a minor child may be obtained only upon the mutual consent, expressed or implied, by the one legally charged with the care of the child and by the one assuming the responsibility.

13

284 Md. at 323. Thus, the Court said, a babysitter temporarily has responsibility for the supervision of a child, and so does a school teacher when the child is at school. *Id.* at 324. Having begun, such responsibility ends as follows:

> [O]nce responsibility for the supervision of a minor child has been placed in a third person, it may be terminated unilaterally by a parent by resuming responsibility, expressly or by conduct. The consent of the third party in such circumstances is not required; he may not prevent return of responsibility to the parent. But, of course, the third person in whom responsibility has been placed is not free to relinquish that responsibility without the knowledge of the parent. For example, a sitter may not simply walk away in the absence of the parents and leave the children to their own devices.

*Id.*

The Court examined the significance of a temporal break in responsibility for supervision of a child in *Anderson v. State*, 372 Md. 285, 812 A.2d 1016 (2002). In that case, a male teacher, who was driving a 14-year-old girl home from school, took a detour to his house where he and the girl had sex. 372 Md. at 289. In holding that the teacher had temporary responsibility for the supervision of his student at the time of the abusive conduct, the Court reasoned that the teacher's responsibility for her supervision began at school and had not yet terminated when they had sex, because he had not yet delivered the girl back to her parents. *Id.* at 295-96. *Anderson* relied heavily on the implied consent of the parents to "any reasonable assistance that a teacher may provide to assure the child's return home from school" and the lack of any "temporal break in the teacher and student relationship" that might, "depending on its length and nature, ... interrupt the implied consent of the parent and dispel the teacher's duty to supervise." *Id.* at 294.

14

This understanding of the statute nearly resolves this appeal. Mr. A. had responsibility for the supervision of Ms. K. when she was in his class, but that responsibility ended when she departed the martial arts studio and her parents resumed their responsibility – thereby terminating the implied consent of the parents and the instructor's duty to supervise. Mr. A.'s subsequent inappropriate behavior in emails and telephone calls occurred when Mr. A. did not have responsibility for her supervision during a temporal break in the teacher-student relationship, when Ms. K. was usually in her own home. By the time Ms. K. got home and exchanged the emails and telephone calls with Mr. A., her parents had responsibility for her supervision, and Mr. A. did not. Therefore, Mr. A.'s out-of-class behavior was not an "act ... by a ... person who *has* ... temporary care or custody or responsibility for the supervision of a child." FL §5-701(x)(1) (emphasis added).[8] Reprehensible as some of Mr. A.'s conduct might be, without more it did not fall within the definition of child abuse under this statute.

---

[8] In her dissent, Judge Adkins suggests that we might construe the definition of "sexual abuse" – and, more specifically, its description of caretaker status – more broadly than the Court has construed its criminal counterpart in cases such as *Anderson*. Tempting as this approach might be, it fails because the definitions in the civil and criminal provisions originated as one. *See* footnote 2 above. This is not to say civil and criminal enforcement are in all respects the same. For a variety of reasons, it may be easier to prove child abuse in a civil proceeding than in a criminal prosecution. The State has a lighter burden of proof in a civil case; unlike a criminal case, adverse inferences may be drawn from a defendant's silence; and the formal rules of evidence do not apply in a civil administrative proceeding. But the legislative DNA of the definition of "child abuse" in the two statutes is identical.

In her dissent, Judge Watts argues that one may have "temporary care" of a child by engaging in remote communications with the child – *e.g.,* by sending an email or a letter that expresses concern or by providing psychological comfort to the child. She offers several reasons for this position. She points out that this would comport with a dictionary definition of "care," which includes providing psychological comfort. In addition, she

The Department has essentially conceded this but argued, both before the ALJ and on appeal, that there is more here – *i.e.*, that Mr. A. engaged in grooming behavior in class that linked the time he was responsible for Ms. K.'s supervision to his sexually explicit out-of-class communications with her.[9]

*Grooming*

The Department contends that Mr. A.'s interactions with Ms. K. during, or immediately after, class constituted systematic "grooming" designed to make her susceptible to sexual exploitation. It points to her testimony that Mr. A. paid special attention to her in class and sometimes spoke to her about personal matters. The

---

argues that "care" must be read in this fashion or else it will be redundant with "responsibility for supervision" elsewhere in the statute. She also urges that it would be consistent with the underlying legislative purpose of protecting children.

Perhaps this idea would have some merit if the statute said "provide care" or "offer care" instead of "has … care" which, like "has … custody," denotes a greater responsibility. In any event, as Judge Watts concedes, the Court has already interpreted "temporary care or custody" as equivalent to "*in loco parentis*," which is inconsistent with Judge Watts' suggested reading of the phrase, and has construed "responsibility for supervision" to cover one who is not *in loco parentis* but who nonetheless has responsibility for a child. Thus, these concepts are not redundant.

In any event, the approach suggested in Judge Watts' dissent would go well beyond this Court's past decisions that sought to interpret the child abuse statutes to carry out the purpose of protecting children consistent with the statutory text and constitutional principles. *See Pope*, 284 Md. at 320-25 (noting issue as to whether child abuse statute was unconstitutionally vague and construing concepts of "care or custody" and "responsibility for supervision"); *Anderson v. State*, 372 Md. 285, 812 A.2d 1016 (2002) (applying the concepts developed in *Pope*).

[9] The Department also agrees that the requisite caretaker status could not ordinarily be established by remote communication alone, although it might be in particular circumstances – such as when a teacher home schools children by video link.

16

Department describes this as "inextricably intertwined with his conduct outside of class" and "part of one continuous chain of events." The Department suggests that what Mr. A. did during class enabled what he did outside of class.

Although the Department in its closing argument at the administrative hearing urged the ALJ to find that grooming occurred,[10] the ALJ found that there was no evidence of inappropriate behavior during class. Moreover, most of the behavior that the Department points to – chatting with Ms. K., sometimes about personal matters, and being "really friendly" – is the same behavior one might expect of a family friend instructing a student.

In their out-of-class communications, Mr. A. spoke at least once about the possibility of engaging in sexual contact during class, such as touching Ms. K. inappropriately while she ostensibly practiced a kick, but he apparently never acted on that idea. The Department also points out that Mr. A. at least once "put his hands on [Ms. K.'s] hips during class," but martial arts classes frequently involve this sort of contact and even Ms. K. said that it was to assist her with a position in class.

We cannot say that the ALJ's conclusion is clearly erroneous or unsupported by the evidence. From our review of the record, there is nothing like the in-school conduct and communications of the defendant in *Walker v. State*, 432 Md. 587, 69 A.3d 1066 (2013). In *Walker*, a teacher's aide at an elementary school who frequently hugged and held hands

---

[10] During its argument to the ALJ, the Department did not explain what particular conduct during class would constitute grooming. During the evidentiary portion of the administrative hearing, the investigating officer identified the email and text messages between Mr. A. and Ms. K. – which occurred outside of class – as the grooming behavior. It appears that the investigating officer viewed the out-of-class communications as grooming behavior for in-person sexual exploitation that ultimately did not materialize.

17

with a third grade girl at the school was found to have exchanged notes in school with her that, among other things, professed his love for her, confessed that he dreamed of sleeping with her in his arms, and analogized their relationship to one depicted in a teenage romance novel. In *Walker*, the defendant conceded that he engaged in this behavior while he had "care or custody or responsibility for the supervision of" the girl at school. This Court held that giving the girl the notes constituted sexual exploitation because "the content and the context of the notes … satisfy the 'sexual' element of exploitation" and "[t]he great pleasure [he] repeatedly describes from exchanging with [the girl] notes that carried a sexual undertone lead us to conclude that he 'received a benefit' from his actions and therefore exploited her." 432 Md. at 625. By contrast, in this case, the ALJ found that "[n]one of the sexually explicit telephone conversations, texting or emails … occurred during [Ms. K.'s] taekwondo classes [and Mr. A.] did not have any sexually inappropriate conversations or touch [Ms. K.] in a sexual manner when [Ms. K.] was … receiving instruction from [Mr. A.]."

Of course, as *Walker* indicates, context is not irrelevant. In some circumstances, actions that, by themselves, do not seem sexually exploitative might, in context, be so. For example, seemingly innocuous actions may nonetheless be sexually exploitative if they meet the standards described in *Walker*: they are sexual in context, and the adult performing the actions receives a benefit from them. 432 Md. at 625. What matters for this case is what Mr. A. did *during class*, or in its immediate context (as in *Anderson*). We cannot simply import all of Mr. A.'s out-of-class behavior into class to satisfy the statutory

18

definition; rather, there must be evidence that Mr. A. engaged in acts that involved sexual exploitation of Ms. K. at the time he had responsibility for her supervision.

The Department urges that this obstacle may be overcome by adopting an expansive understanding of child sexual abuse in order to protect children. *See, e.g.*, *Tribbett v. State*, 403 Md. 638, 943 A.2d 1260 (2008) (sexual abuse can be predicated on conduct that does not constitute a sexual offense in any degree or otherwise violate any provision of Maryland law); *Crispino*, *supra* (sexual abuse can be predicated on French kissing, even though that is not one of the enumerated acts in the statute). It is true that the statute refers to "any act that *involves* sexual ... exploitation" (emphasis added), and this allows the statute to reach more broadly than if it simply referred to sexual exploitation. One meaning of "involves" is "includes," *see, e.g.*, Merriam-Webster's Collegiate Dictionary (11th ed.), *available at* http://www.merriam-webster.com/dictionary/involve, so any conduct that partly is not sexual exploitation and partly is sexual exploitation nonetheless *involves* sexual exploitation.

However, the Department has not pointed to a single action (or course of actions) that Mr. A. took during class that, in context, is even partly sexual exploitation. Being "really friendly" to a student is not sexual exploitation. Talking to a student about how she is doing and what she has done that day is not sexual exploitation. Touching a student's

19

hips during a martial arts class to help the student with a position ordinarily is not sexual exploitation.[11]  Building trust with a student during class is not sexual exploitation.

The Department argues that Mr. A.'s *intent* behind his actions during class was to prepare Ms. K. for out-of-class sexual exploitation.  The Department contends that this intent means that his in-class behavior "involves" sexual exploitation under the statute, even if it is not itself sexually exploitative.  We do not rule out this possibility – that is, that an act can "involve" sexual exploitation because it is performed specifically in order to facilitate sexual exploitation in the future.  But it is not enough to show that a teacher built trust with the student during class and subsequently attempted to sexually exploit the student outside of class.  There would need to be a showing that the teacher took some specific action during class with the specific intention of facilitating sexual exploitation outside of class (rather than, for example, building trust merely in order to facilitate the physically demanding and potentially dangerous martial arts class, as any teacher might do).  The fact that Mr. A. did try to sexually exploit Ms. K. outside of class is not, by itself, enough to prove his intentions during class.  In any event, the record reports very little of what happened during class.

If Mr. A. had given clear indications of romantic feelings during class, then the outcome might be different.  *See Walker*, 432 Md. at 624-25.  If he had said or done anything inappropriate during their conversations immediately after class, while Ms. K.

---

[11] Touching a student's hips could be sexual exploitation if, for example, the teacher touched them inappropriately, but there is no indication of that here.

20

was still at the martial arts center, then the outcome might be different. *See Anderson*, 372 Md. at 295-96. If there was any evidence that he intentionally attempted to use in-class time specifically for the purpose of facilitating out-of-class sexual exploitation of his student, the outcome might be different. But no facts in the record here necessarily lead to an inference that Mr. A. sexually exploited Ms. K. while he had temporary supervisory responsibility for her, and that is what the statutory definition covers.

### D.     Summary

Mr. A. engaged in sexually suggestive telephone and electronic communications with a 15-year-old girl. He thus engaged in sexual exploitative conduct with a child. However, there was substantial evidence to support the ALJ's conclusion that Mr. A. did not have responsibility for the supervision of Ms. K. at the time of this conduct – which occurred outside of class while Mr. A. and Ms. K. were not in each other's presence. Mr. A. did have responsibility for the supervision of Ms. K. while she was at the martial arts school, but none of the sexually exploitative conduct occurred at that time. Although grooming behavior in class could, in conjunction with sexually exploitative conduct outside of class, support a finding of indicated child sexual abuse, the ALJ's conclusion that there was insufficient evidence for such a finding here was not clearly erroneous.[12]

---

[12] It may be that an appropriate finding, when there is insufficient evidence that an individual who has had responsibility for the supervision of a child continued to have that responsibility at a time when the individual engaged in sexually exploitative conduct, is "unsubstantiated" rather than "ruled out." However, neither party in this case suggested that the Department's finding should be modified to "unsubstantiated."

We note that the Department relies on a few out-of-state cases construing statutes that appear to be broader than the Maryland statute. In some states, all that is required is that the alleged abuser be in a "position of trust" with respect to the alleged victim. *See Pellman v. People*, 252 P.3d 1122 (Colo. 2011) (construing Colo. Rev. Stat. Ann. §18-3-401(3.5)). The General Assembly has the power to adopt such a statute in Maryland if it wishes to do so.[13]

## III

## Conclusion

For the reasons set forth above, there is substantial evidence to support the ALJ's determination that the Department should modify its finding from "indicated" to "ruled out."

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

---

[13] The regulation that the Department disclaimed in this case also might be a starting point for such a statute. *See* footnote 1 above.

Circuit Court for Wicomico County
Case No.: 22-C-12-001286
Argued: June 3, 2015
Reargued: December 3, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 46

September Term, 2014

WICOMICO COUNTY DEPARTMENT OF
SOCIAL SERVICES

v.

B.A.

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Glenn T., Jr. (Retired,
    Specially Assigned),

JJ.

Dissenting Opinion by Adkins, J.

Filed: July 12, 2016

*Battaglia, J., now retired, participated in the
hearing and conference of the case while an
active member of this Court; after being recalled
pursuant to the Constitution, Article IV, Section
3A, she also participated in the decision and
adoption of the majority opinion.

Respectfully, I dissent in part from the Majority's opinion and holding. I concur with Judge Watts's Dissent ("Watts Dissent"), but depart from some of its reasoning. The Watts Dissent relies heavily on our decision in *Anderson v. State*, 372 Md. 285 (2002), a criminal case involving child sexual abuse committed by a teacher away from the school premises. Certainly *Anderson* is instructive regarding the issue presented herein, and I concur with her view that *Anderson* declined to take a narrow view of the Art. 27, § 35C(b) requirement that the defendant have "temporary care or custody or responsibility for the supervision of a child."

But the Majority never reckons with the material difference between *Anderson* and this case—namely, that the sexual abuse occurred when the defendant was driving the child home from school, and doing so, we held, with the **implied consent of the child's mother**. Implied consent was the foundation of our holding in *Anderson*. Recognizing that consent by the legal guardian is the only basis for a third party to obtain responsibility for the supervision of a minor child, we held that when a parent entrusts his or her child to a school, the parent "'impliedly consents to all reasonable measures taken by a teacher to assure the safe return of the child from school[.]'" *Anderson*, 372 Md. at 294 (citation omitted).

We then extended the reach of the implied consent doctrine, reasoning that the absence of any temporal break between the teacher's supervision at school and continued supervision while driving the child home, created an "'indivisible, ongoing relationship.'" *Id.* at 294–96 ("It is the school related activity immediately connected to the abuse . . . that provides the basis of supervision . . . . 'From the moment he extended his invitation until the time he and [the victim] had sexual intercourse, she was never for long, if ever, either

out of his sight or, for that matter, out from under his influence or control.'") (citations omitted). Although the sexual abuse took place at the teacher's home, we considered that part of his trip to take the student home. *See id.*

Here, unlike *Anderson*, there *was* a break between B.A.'s role as instructor at the martial arts school, and he never undertook to take the child home. His inappropriate sexual advances to the minor by texts and during telephone calls occurred remotely, in the evening. Accordingly, the implied parental consent to transport a child home from school that was central to our decision in *Anderson* simply does not sustain us here.

I think the statute reaches B.A.'s conduct not by a theory of implied parental consent, but by a settled rule of statutory construction—that a civil, remedial statute, if ambiguous, should be interpreted in favor of furthering the legislative remedial purpose. *See Opert v. Crim. Injuries Comp. Bd.*, 403 Md. 587, 593 (2008) ("If . . . we conclude that 'the language is subject to more than one interpretation, it is ambiguous, and we resolve that ambiguity by looking to the statute's legislative history, case law, and statutory purpose.'") (citations omitted). It cannot be disputed that the remedial purpose of Md. Code (1984, 2012 Repl. Vol.), § 5-701(x)(1) of the Family Law Article ("FL") is the protection of children. As the statute reads, "'[s]exual abuse' means any act that involves sexual molestation or exploitation of a child by a parent or other person who **has** permanent or temporary care or custody or responsibility for supervision of a child[.]" FL § 5-701(x)(1) (emphasis added). We need to decide whether, in this civil statute, the phrase, "other person who has . . . temporary care or custody or responsibility" imposes a strict temporal requirement in order to invoke inclusion of B.A. in the "confidential

2

computerized database that contains information regarding child abuse[.]" FL § 5-701.  I

emphasize that this statute is civil, because I would differentiate our holding from any

criminal case with similar facts.  Also the registry on which B.A. and this incident would

be included is only accessible by "(1) the protective services staff of the Administration;

(2) the protective services staffs of local departments who are investigating a report of

suspected abuse or neglect; and" (3) law enforcement personnel who are investigating a

report of suspected abuse or neglect.  FL § 5-714.[1]

---

[1] This statute is not nearly as restrictive of a registrant's conduct, nor so public, as the sexual registry required after conviction of certain sexual abuse crimes.  We described the severity of that statute in *Doe v. Department of Public Safety & Correctional Services*, 430 Md. 535, 562 (2013):

> Petitioner currently must report in person to law enforcement every three months, give notice to law enforcement of his address and any changes of address, and notify law enforcement before being away from his home for more than seven days. . . .  Furthermore, he must disclose to the State a significant amount of information, some of which is highly personal, including: his employment address; information about his conviction; his social security number; his email address and computer log-in names; information about vehicles he often uses, including those not owned by him; his finger prints and palm prints; all "identifying factors, including a physical description," and an updated digital image of himself. *See* C.P. §§ 11–706, 11–707 (2001, 2008 Repl.Vol., 2012 Cum.Supp.).  Additionally, other than to vote, Petitioner is prohibited from entering onto real property that is used as a school or a family child care center licensed under Title 5, Subtitle 5 of the Family Law Article, without first obtaining permission. . . .  If Petitioner fails to comply with these requirements, he faces terms of imprisonment, depending on the violation, of up to three or five years.

If we were dealing with that public sex offender registry, our conclusions here may be different.

One reasonable way to interpret this section is to read the phrase "other person who **has** . . . temporary care or custody or responsibility" liberally to mean that the section would prohibit sexual exploitation of a child, so long as the adult, in an *ongoing relationship* exercises responsibility and in person care for the child, with the further proviso that there be a *significant connection* between the abuse and the in-person care. I would require that the care be in person, but the abuse may occur by other means. The evidence in this case can readily support a factual conclusion that would meet this standard.

Like Judge Watts's dissent, my analysis depends on the strength of a teacher's relationship with, and influence on, the child, which may be presumed. The authority exercised by this instructor, together with the student's desire to excel in this martial arts program could bolster that presumption. The telephonic communications would support a conclusion that B.A. repeatedly drew upon the martial arts culture, calling her a "warrior," and saying that he was "very proud that [she was] working out so hard," and that "You ARE strong . . . among many other wonderful traits." (Ellipsis in original.) He also offered, more than once, to drive her to a workshop on tai chi. In another email, he wrote "I'm sorry that you got hurt in class. I . . . can only hope that you're alright? . . . [Y]ou're beyond beautiful and wonderful." He exerted his authority as a martial arts instructor by threatening to discipline V.K.'s boyfriend, writing that the boyfriend's jealousy was a problem, and that B.A. "[could] not allow this type of vibe/attitude in my work[]place. He's either going to fix it or I'm talking to him. And if it still doesn't change I'm going to be forced to not allow him to come anymore[.]"

4

V.K. responded to some of his emails and texts and engaged in a five-hour phone conversation with him. It is reasonable to conclude that she would not have done so, absent the student-teacher relationship. In short, there was more than enough evidence to support a conclusion that there was a substantial connection between the martial arts instruction and the telephonic sexual abuse. This leads me to a conclusion that the ALJ erred in concluding that because there was "a clear temporal break in the taekwondo-instructor/taekwondo-student relationship when the sexual correspondence took place . . . the local department failed to show an instructor-student relationship between" B.A. and V.K. when the sexual communication occurred. To be sure, there was a temporal break, but in this civil case, that, on its own, does not eliminate the possibility that B.A. violated FL § 5-701.

In conclusion, unlike the Majority, I would vacate the judgment and opinion of the Court of Special Appeals, and remand to that Court with instructions to remand to the Circuit Court for further remand to the ALJ to make additional findings not inconsistent with this opinion.

5

Circuit Court for Wicomico County
Case No. 22-C-12-001286
Argued: June 3, 2015
Reargued: December 3, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 46

September Term, 2014

_____

WICOMICO COUNTY DEPARTMENT OF
SOCIAL SERVICES

v.

B.A.

_____

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T. (Retired,
Specially Assigned),

JJ.

_____

Dissenting Opinion by Watts, J., which Harrell,
J., joins

_____

Filed: July 12, 2016

*Battaglia, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of the majority opinion.

Respectfully, I dissent. The Majority narrowly construes a statute that the General Assembly enacted to protect children—the most vulnerable members of society—from sexual predators. In doing so, the Majority chips away at the legal deterrents against sexual exploitation of children.

In addition to exposing children to harm, the Majority Opinion is non-forward-looking. In today's digital age, with increasing frequency, children engage in remote communications (*e.g.*, e-mails, telephonic conversations, or text messages) with people who have permanent or temporary care, custody, or responsibility for the supervision of them.

This issue in this case is whether a teacher can commit "sexual abuse" as defined by Md. Code Ann., Fam. Law (1984, 2012 Repl. Vol.) ("FL") § 5-701(x)(1) ("'Sexual abuse' means any act that involves sexual molestation or exploitation of a child by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member.") by sexually exploiting a student through remote communications.

The Majority narrowly construes FL § 5-701(x)(1) so that it applies only to in-person contact between a child student and a teacher who is a sexual predator. I respectfully disagree with the Majority's reasoning, and would hold that a teacher can commit "sexual abuse" as defined by FL § 5-701(x)(1) by sexually exploiting a student through remote communications.

This case's material facts are undisputed. On January 11, 2012, the Wicomico

County Department of Social Services ("the Department"), Petitioner, notified B.A.,[1] Respondent—the "grandmaster" of Park's Martial Arts ("Park's"), a martial arts school in Salisbury, Maryland—that the Department had found B.A. responsible for indicated child sexual abuse. B.A. appealed. On June 12, 2012, an administrative law judge ("the ALJ") of the Maryland Office of Administrative Hearings conducted a hearing.

On July 20, 2012, the ALJ issued a decision in which the ALJ found the following facts, which I summarize. From October 2010 through Spring 2011, V.K.[2] was a fifteen-year-old female student at Park's, where B.A. was V.K.'s teacher.[3] The record reveals that V.K. was in B.A.'s classes up to three times per week, and that V.K. believed that B.A. obtained her cell phone number and e-mail address from school records. In December 2010, B.A. texted V.K. to ask for a photograph of her. In February 2011, B.A. e-mailed V.K. and attached photographs of naked women who were posing in an erotic manner. In his e-mail, B.A. informed V.K. that he wanted her to pose like the women in the photographs. At one point, B.A. remotely informed V.K. that he could go "out of his body[,]" and that, "if she felt anything[,] it would be hi[s] having sex with her in a spiritual manner." At approximately midnight on a night in February or March 2011, B.A. telephoned V.K., initiating a conversation that lasted until approximately 5:00 a.m. According to V.K., during this conversation, B.A. told V.K. that he wanted to "talk dirty" to her; said that he was "hard"; said that he wanted her to touch his penis; said that he

---

[1]The Court of Special Appeals granted a motion to refer to B.A. by his initials.
[2]To protect her privacy, I refer to V.K. by her initials.
[3]The record reveals that V.K. had also taken B.A.'s martial arts classes when she was younger.

wanted to have sex with her; and said that, to show her how much he loved her, he wanted to touch her vagina while he was teaching her to do a kick during martial arts class. The following morning, B.A. telephoned V.K. again, and, while breathing heavily, told V.K. that he was masturbating.

The ALJ admitted into evidence the following e-mails between B.A. and V.K. On February 28, 2011, B.A. e-mailed V.K. to state: "How are you doing? It would be good to hear from you[.]" On March 31, 2011, B.A. e-mailed V.K. to state: "I adore you so much . . . . I'm certain[]ly a lucky guy."

On May 5, 2011, B.A. e-mailed V.K. to state: "I'm very proud that [you're] working out so hard[.]" Later that day, V.K. replied to state: "Thank you. I wanna be strong[.]" Still later that day, B.A. replied to state: "You ARE strong...among many other wonderful traits!" (Ellipsis in original).

On May 7, 2011, B.A. e-mailed V.K. to state:

Hi Beautiful Warrior! Been thinking about [yo]u a lot . . . . This Friday I leave for Tai Chi weekend workshop. Wish [yo]u were going. There's still room if [yo]u wanna go up. I'll drive . . . . [H]ow was [yo]ur day? What do [yo]u do for fun? . . . . [D]oes [your boyfriend] ever smile, joke[,] or laugh . . .? He always seems so serious[.] I would LOVE to hear from [yo]u MUCH MORE. Tell me more about [yo]ur life, thoughts, [yo]ur inner workings, etc.

(Paragraph breaks omitted). On May 8, 2011, V.K. e-mailed B.A. to tell him what she did for fun and to state: "[My boyfriend] smiles A LOT . . . . He just doesn't smile around you.[H]e feels [that] you like me a little to[o] much." Later that day, B.A. e-mailed V.K. to state: "[E]ven b[efore you] started training[, your boyfriend] was serious and somber[,] more so than any other student." Still later that day, V.K. e-mailed B.A. to state: "[My

boyfriend] thinks [that] you have a thing for me[.]" Still later that day, B.A. e-mailed V.K.

to state: "[You're] so sweet[.]"

At some point on May 8, 2011, V.K. e-mailed B.A. and attached a photograph of

another female in a prom dress. B.A. replied to state: "I thought you were sending me pics

of you. (B[y the way]: That would be nice and welcomed...hint)[.]" (Ellipsis in original).

V.K. replied to state: "I don't think [that] pictures would be appropriate[.]"

On May 12, 2011, B.A. e-mailed V.K. to state:

I'm sorry that you got hurt in class. I . . . can only hope that you're alright?
. . . . [Y]ou're beyond beautiful and wonderful[,] . . . and[,] every time I see
you[,] my heart feels enlivened. . . . [D]oes [your boyfriend] know[ that] we
write, and particularly that we write using these aliases[4] . . . ? . . . . [D]ue to
our "age differences" and our "professional relationship[,]" this could be
seen as weird to virtually anyone . . . . I would erase all of our past
correspondences NOW[—]and[,] from now on[,] use no personally
identifying questions or comments unless you immediately erase them . . . .
If you wish to share our e-mails with others[,] . . . then it would be prudent
to ONLY discuss "normal or professional" things using our original
"normal" e-mail addresses. . . . Tonight[, your boyfriend] was very odd at the
end of class. . . . [Y]our varying moods and cavalier attitude when I do see
you do[]n't necessarily instill the utmost confidence. . . . I am an extremely
private man[,] and [I] don't want any[]thing about my life to be shared with
anyone EVER unless I specifically say otherwise.

(Paragraph break omitted). Later that day, B.A. e-mailed V.K. to state:

Not sure why all of a sudden [your boyfriend's] jealousy has reached such a
state that he's acting that way towards me[.] What are you saying to him? .
. . [H]e is just going to have to deal with guys looking at his girlfriend because
she is beautiful. . . . If he can't handle it[,] then maybe he should look for a
girl who's not as attractive . . . . I don't want to hear anything about m[y]
being "inappropriate" since I am older or a teacher . . . . I cannot allow this
type of vibe/attitude in my work[]place. He's either going to fix it[,] or I'm
talking to him. And if it still doesn't change[,] I'm going to be forced to not

---

[4]B.A. and V.K. e-mailed each other using e-mail accounts that did not identify them
by name.

- 4 -

allow him to come anymore[,] since it will hurt our school . . . . [I]f you can fix it without causing more problems[,] . . . then please do so.

(Paragraph breaks omitted).

The ALJ concluded as a matter of law that B.A.'s sexually explicit remote communications with V.K. constituted sexual exploitation; however, the ALJ reasoned that, because the sexual exploitation occurred via remote communications, B.A. was not providing "temporary care" for V.K. when he engaged in the sexual exploitation. Accordingly, the ALJ concluded as a matter of law that the Department had not met its burden to prove that B.A. was responsible for indicated "child abuse" as defined by FL § 5-701(x)(1), and the ALJ modified the Department's finding that B.A. was responsible for indicated child abuse to "ruled out."

The Department petitioned for judicial review, and the Circuit Court for Wicomico County affirmed. The Department appealed, and the Court of Special Appeals affirmed in an unreported opinion. The Department filed a petition for a writ of *certiorari*, which this Court granted. See Wicomico Cnty. Dep't of Soc. Servs. v. B.A., 439 Md. 328, 96 A.3d 143 (2014).

No reported Maryland opinion addresses the scope of the phrase "sexual abuse" as defined by FL § 5-701(x)(1) ("'Sexual abuse' means any act that involves sexual molestation or exploitation of a child by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member."). This Court, however, has addressed—and broadly construed—the scope of the term "abuse" as used in the statutes that have criminalized child abuse.

Specifically, in <u>Anderson v. State</u>, 372 Md. 285, 287, 289-90, 812 A.2d 1016, 1018, 1019 (2002), this Court held that the evidence was sufficient to support a finding that, under a statute that criminalized child abuse,[5] a high school teacher had "responsibility for the supervision of a" student where the teacher offered to drive the student home from school; the student accepted the offer; and the teacher drove the student to the teacher's home, where the teacher engaged in sexual intercourse with the student. This Court concluded that: (1) the student's parent impliedly consented to the teacher's driving the student home from school, and, thus, the teacher "assume[d] the responsibility of supervising" the student; and (2) the teacher's responsibility for the student's supervision did not end outside school grounds, as "there was no temporal break in the" teacher-student relationship; from the time of the offer of a ride to the time of the sexual intercourse, the student "was never for long, if ever, either out of [the teacher's] sight or, for that matter, out from under his **influence or control**." <u>Id.</u> at 294-95, 812 A.2d at 1022 (quoting <u>Anderson v. State</u>, 142 Md. App. 498, 509-10, 790 A.2d 732, 739 (2002)) (emphasis added); <u>see also</u> <u>Anderson</u>, 372 Md. at 295, 812 A.2d at 1022 ("At bottom, a teacher-student relationship is based on **the student's trust and acquiescence to [the] teacher's authority**. At no time was there a temporal break in that relationship so that we might conclude the relationship inducing both trust and acquiescence to authority have at least temporally ended." (Quoting <u>Anderson</u>, 142 Md. App. at 510, 790 A.2d at 739) (emphasis added)). Thus, the teacher's

---

[5]At the time, the statute was codified as Md. Code Ann., Art. 27 (1957, 1996 Repl. Vol., 2001 Supp.) § 35C(b), which stated: "A parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a child or a household or family member who causes abuse to the child is guilty of a felony[.]"

"official supervisory interactions with the [child] that began at school, his transportation of her that was initiated at school, and his sexual involvement with her together constituted an **indivisible, ongoing relationship**." Anderson, 372 Md. at 295-96, 812 A.2d at 1023 (emphasis added) (citation and internal quotation marks omitted); see also id. at 297, 812 A.2d at 1023 (This Court favorably quoted State v. Pasteur, 9 S.W.3d 689, 697 (Mo. Ct. App. 1999) ("By virtue of [the teacher]'s position, he was **able to exert influence upon [the student], not only within the confines of the school, but outside of it as well**.") (Emphasis added)).

This Court's broad construction of the statute that criminalized child abuse in Anderson, 372 Md. at 287, 812 A.2d at 1018, was warranted by the circumstance that the purpose of the statutes that criminalize child abuse is to "target the ever-shifting manner in which some people will target and abuse children[,]" Walker v. State, 432 Md. 587, 627, 69 A.3d 1066, 1090 (2013); accordingly, this Court has joined "the modern trend in broadly recognizing and punishing all forms of child abuse[,]" Degren v. State, 352 Md. 400, 424, 722 A.2d 887, 899 (1999) (footnote omitted)). These considerations apply with equal force in interpreting FL § 5-701(x)(1), whose language regarding the people to whom it applies—"a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or . . . any household or family member"—is substantively identical to the relevant language in the statutes that have criminalized child abuse. See Md. Code Ann., Art. 27 (1957, 1996 Repl. Vol.) § 35C(b); Md. Code Ann., Crim. Law (2002, 2012 Repl. Vol., 2014 Supp.) ("CR") §§ 3-601(b)(1), (d)(1) (Child Abuse), 3-602(b)(1) (Sexual Abuse of a Minor).

Here, recognizing that FL § 5-701(x)(1)'s purpose, like CR § 3-602's purpose, is to "target the ever-shifting manner in which some people will target and abuse children[,]" Walker, 432 Md. at 627, 69 A.3d at 1090, and remaining in accord with "the modern trend in broadly recognizing and punishing all forms of child abuse[,]" Degren, 352 Md. at 424, 722 A.2d at 899 (footnote omitted), even giving some deference to the ALJ's interpretation of FL § 5-701(x)(1),[6] this Court's precedent compels the conclusion that a teacher commits "sexual abuse" as defined by FL § 5-701(x)(1) where the teacher takes advantage of an ongoing teacher-student relationship to exert authority, influence, or control over the student via sexually exploitative remote communications. See FL § 5-701(x)(1) ("'Sexual abuse' means any act that involves sexual . . . exploitation of a child by a . . . person who has . . . temporary care . . . of a child[.]").

As used in FL § 5-701(x)(1), the term "care" is not limited to in-person contact between a teacher and a student. Otherwise, the term "care" would be impermissibly redundant with the phrase "responsibility for supervision." See Woznicki v. GEICO Gen. Ins. Co., 443 Md. 93, 108, 115 A.3d 152, 161 (2015) (A court reads a statute "so that no word . . . or phrase is rendered superfluous[.]" (Citation omitted)). It is readily apparent from FL § 5-701(x)(1)'s language—"permanent or temporary care or custody or responsibility for supervision of a child"—that "care" has a meaning that is distinct from the meaning of "custody" and "responsibility for supervision." The term "care" has a

---

[6]"[A]n agency's legal interpretation of [a] statute [that] it administers . . . is entitled to some deference[.]" Charles Cnty. Dep't of Soc. Servs. v. Vann, 382 Md. 286, 295-96, 855 A.2d 313, 319 (2004) (citations omitted).

broader meaning, including: "*Family law*. The provision of physical or psychological comfort to another, esp[ecially] . . . [a] child[.]" Care, Black's Law Dictionary (10th ed. 2014).[7] The reason for utilizing a broad definition of "care" is obvious—the protection of children.

The Majority states that "[t]his Court has previously said that 'temporary care or custody' is equivalent to '*in loco parentis*,' a relatively restrictive classification that 'arises only when one is willing to assume all the obligations and to receive all the benefits associated with one standing as a natural parent to a child.'" Maj. Slip Op. at 13 (quoting Pope v. State, 284 Md. 309, 323, 396 A.2d 1054, 1063 (1979)). In turn, in Pope, 284 Md. at 322, 396 A.2d at 1063, this Court stated that "Bowers [v. State, 283 Md. 115, 389 A.2d 341 (1978)] equates 'permanent or temporary care or custody' with 'in loco parentis[.]'" (Underlining added).

In Bowers, 283 Md. at 116, 389 A.2d at 343, a defendant contended that the statute that criminalized child abuse was void-for-vagueness. Specifically, the defendant argued that

> the failure of the statute to include any definition of the phrase "temporary care or custody" creates a[n] ambiguity of constitutional dimension, since neither [the defendant] nor others similarly situated would have had any way of knowing whether they fell within the class of persons [who are] subject to prosecution under the [statute].

---

[7]"Care" has also been defined as "[t]he provision of what is necessary for the health, welfare, maintenance, and protection of someone[.]" Care, Oxford Dictionaries (Oxford University Press 2015), http://www.oxforddictionaries.com/us/definition/american _english/care [https://perma.cc/LK4Q-GZ2E]. This definition does not imply that the care must be provided in person.

Id. at 119, 389 A.2d at 344. This Court disagreed and stated:

> [T]he [] General Assembly [] intended that the statute here apply to persons who stood in [loco parentis] to a child. Had the [General Assembly] wished to narrow application of the child abuse [statute] to those who had been awarded custody or control by court order, it could readily have done so in explicit language to that end.

Id. at 130, 389 A.2d at 350. In other words, in Bowers, id. at 130, 389 A.2d at 350, in the context of a void-for-vagueness challenge, this Court broadly construed the statute that criminalized child abuse and concluded that the statute did not apply only to people who had court-ordered custody or control of a minor.

B.A.'s many e-mails to V.K. and displays of concern for V.K.'s welfare constituted the administration of psychological comfort to—*i.e.*, "care" of—V.K. On three occasions, B.A. e-mailed V.K. to ask how she was doing. In one such e-mail, B.A. stated: "I'm sorry that you got hurt in class[.]" On another occasion, B.A. e-mailed V.K. to state: "I'm very proud that [you're] working out so hard[.]"[8] In essence, this case's facts exemplify the circumstance of a teacher who administers care to a student through remote communications during an ongoing teacher-student relationship.

Just as the term "care" is not limited to in-person contact between a teacher and a student, the term "care" is not limited to contact that occurs when the student, the teacher, or both are on school grounds. This Court has already held that a teacher can be responsible

---

[8]Additionally, in three e-mails, B.A. called V.K. "beautiful." B.A. also complimented V.K. via e-mail by calling her "attractive," "sweet," and "wonderful"; stating that V.K. was "strong...among many other wonderful traits"; stating that, "every time" B.A. saw V.K., his "heart fe[lt] enlivened"; stating that B.A. "adore[d V.K.] so much"; and stating that B.A. was "certain[]ly a lucky guy." (Ellipsis in original).

- 10 -

for supervising a student—and thus, the teacher can commit sexual abuse of the student—when both the teacher and the student are outside the school grounds.  See Anderson, 372 Md. at 287, 812 A.2d at 1018.  Although "responsibility for supervision," rather than "care," was at issue in Anderson, id. at 287, 812 A.2d at 1018, this Court's recognition of the power of a teacher-student relationship applies with equal force in considering "care."  This is so because, regardless of a particular case's circumstances, "[b]y virtue of [a teacher]'s position, [the teacher is] able to exert influence upon [a student], not only within the confines of the school, but outside of it as well."  Id. at 297, 812 A.2d at 1023 (citation omitted).  Plainly put, a teacher does not stop being a teacher when he or she leaves the school grounds; regardless of the location, a teacher and a student are in an "indivisible, ongoing relationship" that "is based on the student's trust and acquiescence to [the] teacher's authority[,]" "influence[, and] control."  Id. at 296, 295, 812 A.2d at 1023, 1022 (citations and internal quotation marks omitted).  It is logical that a teacher who is in an ongoing teacher-student relationship with a student, and who undertakes care for the child outside of the school grounds, must not be permitted to take advantage of the student.

Just as a teacher is able to exert authority, influence, or control over a student in person while both are outside the school grounds, the teacher is able to exert authority, influence, or control over the student via remote communications while both are outside the school grounds.  In any remote communication that calls for a response—even something as simple as an e-mail in which a teacher asks: "How are you?"—the teacher, by virtue of the teacher-student relationship, obligates the student to share information and spend time and effort, however little, on a response.  The teacher-student relationship plays

an even greater role where the teacher directly or indirectly refers to the relationship—for example, a teacher could e-mail a student to state: "You were unusually quiet in class today. Are you okay?" If the student chooses to respond to the teacher's remote communication, the student's choice is at least partially driven by the teacher-student relationship; the student sees the teacher on a regular basis at the school, and the student is aware that, if the student chooses to ignore the teacher's remote communications, the student risks having an uncomfortable and/or awkward in-person encounter with the teacher at the school. By way of hypothetical comparison, if a random stranger e-mailed, telephoned, or texted a minor requesting information about the minor's life, the minor would almost certainly refrain from responding. The only plausible explanation for a student's responses to a teacher's remote communications is the ongoing teacher-student relationship.

Significantly, my conclusion is supported by FL § 5-701(x)(1)'s purpose, which is to protect vulnerable children from sexual predators. See Walker, 432 Md. at 627, 69 A.3d at 1090. To conclude otherwise would exempt teachers who happen to be such predators from liability for "sexual abuse" as defined by FL § 5-701(x)(1)—and, by logical extension, liability under FL § 5-701(x)(1)'s criminal counterparts CR §§ 3-601(b)(1), (d)(1) (Child Abuse) and 3-602(b)(1) (Sexual Abuse of a Minor)—simply by virtue of the circumstance that the predators preyed on students remotely instead of in person.

Additionally, my conclusion is consistent with FL § 5-701(x)(1)'s legislative history. The first statute to use the phrase "temporary care or custody" in illegalizing harm to a minor was Md. Code Ann., Art. 27 (1957, 1963 Supp.) ("Art. 27") § 11A (Assault on Child), which the General Assembly enacted in 1963. Art. 27 § 11A stated: "Any parent,

adoptive parent[,] or other person who has the permanent or temporary care or custody of a minor child under the age of fourteen years who maliciously beats, strikes, or otherwise mistreats[] such minor child to such degree as to require medical treatment for such child shall be guilty of a felony[.]" Obviously, the acts that Art. 27 § 11A illegalized (beating, striking, and physically mistreating) could occur only in person; however, eleven years later, the General Assembly broadened the category of illegal harm to a minor by adding sexual exploitation without physical injury. See Md. Code Ann., Art. 27 (1957, 1971 Rep. Vol., 1974 Supp.) §§ 35A(a) ("Any parent, adoptive parent[,] or other person who has the permanent or temporary care or custody or responsibility for the supervision of a minor child under the age of eighteen years who causes abuse to such minor child shall be guilty of a felony[.]"); 35A(b)(7)(B) ("'Abuse' shall mean . . . any sexual abuse of a child, whether physical injuries are sustained or not." (Emphasis added)); 35A(b)(8) ("'Sexual abuse' shall mean any act or acts involving sexual molestation or exploitation[.]" (Emphasis added)).[9]

It would be illogical to conclude that the General Assembly broadened the category of illegal harm to a minor to include sexual exploitation without physical injury, yet intended to limit such illegal harm to in-person contact between an adult and a child. Of course, in 1974, many modern methods of remote communication, including e-mail, text messaging, and instant messaging, were not in widespread use; however, other methods of remote communication, such as telephonic conversation and letter writing, existed in 1974

---

[9]In 1970, the General Assembly recodified Art. 27 § 11A as Art. 27 § 35A.

and remain in widespread use. Indeed, even today, sexual predators use these older methods of remote communication to contact victims. For example, in this case, B.A. engaged in telephonic conversation with V.K.; and, in Walker, 432 Md. at 592, 69 A.3d at 1069, a school employee wrote "to an eight-year-old female student a series of notes in which he repeatedly professed his love for her, shared fantasies of kissing and holding her, and expressed jealousy about her having a boyfriend."

My conclusion, of course, would not alter the principle that "responsibility for supervision of a minor child may be obtained only upon the mutual consent, expressed or implied, by the one legally charged with the care of the child and by the one assuming responsibility." Anderson, 372 Md. at 293, 812 A.2d at 1021 (citation omitted). In other words, consent remains an element of "responsibility for supervision." I simply recognize that mutual consent, express or implied, is not required for "care." This Court has interpreted "responsibility for supervision" to require mutual consent, stating:

> 'Responsibility' in its common and generally accepted meaning denotes 'accountability,' and 'supervision' emphasizes broad authority to oversee with the powers of direction and decision. . . . Absent a court order or award by some appropriate proceeding pursuant to statutory authority, we think it to be self-evident that responsibility for supervision of a minor child may be obtained only upon the mutual consent, expressed or implied, by the one legally charged with the care of the child and by the one assuming responsibility. In other words, a parent may not impose responsibility for the supervision of his or her minor child on a third person unless that person accepts the responsibility, and a third person may not assume such responsibility unless the parent grants it.

Id. at 293, 812 A.2d at 1021 (ellipsis in original) (citation and some internal quotation marks omitted). As stated above, "care" has a broader definition, including the provision of what is necessary for the health, welfare, maintenance, and protection of a child, and the

- 14 -

administration of psychological comfort, which does not necessarily require mutual consent, express or implied.  To conclude otherwise would lead to illogical results.  For example, suppose that a child is playing outside and injures herself.  A neighbor invites the child inside to get a bandage.  Once inside, the child is sexually molested by the neighbor.  In this scenario, the child's parent did not consent to the neighbor's providing care for the child.  Simply stated, an adult who undertakes to provide care of a child without a parent's consent should be held accountable for any abuse or molestation or exploitation of the child, despite the circumstance that there may have been no mutual consent, express or implied, for the adult's care of the child.

For the above reasons, a teacher commits "sexual abuse" as defined by FL § 5-701(x)(1) where the teacher takes advantage of an ongoing teacher-student relationship to exert authority, influence, or control over the student via sexually exploitative remote communications.  I note that my conclusion is expressly tied to a teacher-student relationship that is "ongoing," and I do not express an opinion on whether FL § 5-701(x)(1) applies where there is a former teacher-student relationship or no teacher-student relationship.[10]  Additionally, my conclusion would obviously not apply where a teacher does not engage in "any act that involves sexual molestation or exploitation" of a student.

---

[10]For example, the ALJ posed a hypothetical that was similar to the following.  A thirteen-year-old tutors an eight-year-old neighbor.  The tutor moves away and has no contact with the other minor until six years later, at which point the two begin a consensual sexual relationship at ages nineteen and fourteen, respectively.  My conclusion would not apply to this scenario because the sexual relationship did not occur while the teacher-student relationship was ongoing.

- 15 -

FL § 5-701(x)(1).[11]

This case's facts provide a prime example of how a teacher can commit "sexual abuse" as defined by FL § 5-701(x)(1) where the teacher takes advantage of an ongoing teacher-student relationship to exert authority, influence, or control over the student via sexually exploitative remote communications.

All of B.A.'s relevant e-mails to V.K. occurred while B.A. was teaching classes to V.K. up to three times per week, and many of B.A.'s e-mails to V.K. were inextricably intertwined with the ongoing teacher-student relationship. For example, in one e-mail, B.A. referred to V.K. as a "warrior," which, ostensibly, was a reference to the fact that V.K. was a student of martial arts. On a related note, in the same e-mail, B.A. offered to drive V.K. to a workshop on tai chi, which is an exercise that is similar to martial arts. B.A. once e-mailed V.K. to state that her boyfriend "always seem[ed] so serious" **at the school**. Later, B.A. e-mailed V.K. to state that, "even b[efore you] started training[ **at the school**, your boyfriend] was serious and somber[,] more so than any other **student**." (Emphasis added). Still later, B.A. e-mailed V.K. to state:

> I'm sorry that you got hurt **in class**. . . . [D]ue to . . . our "**professional relationship**[,]" this could be seen as weird to virtually anyone . . . . Tonight[, your boyfriend] was very odd **at the end of class**. . . . [Y]our varying moods and cavalier attitude when I do see you [**at the school**] do[]n't necessarily instill the utmost confidence.

---

[11]At initial oral argument, the Department seemingly contended that, even if a teacher did not engage in any sexually explicit or suggestive activity with a student at any time, the teacher might have engaged in sexual exploitation by forming a close relationship with the student. As Judge Battaglia aptly pointed out, "that leads you down a very dangerous path." Teachers often form close relationships with students without any intention of grooming the students for sexual activity. Clearly, I do not conclude that simply forming a close relationship with a student alone constitutes sexual exploitation.

(Emphasis added) (paragraph breaks omitted).  On the same day, B.A. e-mailed V.K. to state:

> Not sure why all of a sudden [your boyfriend's] jealousy has reached such a state that he's acting that way towards me [**at the school**] . . . . I don't want to hear anything about m[y] being "inappropriate" since I am . . . **a teacher** . . . . I cannot allow this type of vibe/attitude **in my work[]place**. . . . I'm going to be forced to not allow him to come anymore since it will hurt **our school**[.]

(Emphasis added) (paragraph breaks omitted).  Additionally, during a telephonic conversation, B.A. told V.K. that he wanted to touch her vagina while he was teaching her to do a kick **during martial arts class**.

B.A. utilized the ongoing teacher-student relationship to exert authority, influence, or control over V.K. by sending remote communications that either called for responses or included instructions to V.K.  In one e-mail, B.A. offered to drive V.K. to a workshop.  In one e-mail and one text message, B.A. asked V.K. for a photograph of her.  In three e-mails, B.A. asked V.K. how she was doing.  In one such e-mail, B.A. stated: "It would be good to hear from you"; in another such e-mail, B.A. stated: "I would LOVE to hear from [yo]u MUCH MORE.  Tell me more about [yo]ur life, thoughts, [yo]ur inner workings, etc."  In three e-mails, B.A. asked V.K. for information about her boyfriend.  In one such e-mail, B.A. complained about what he perceived to be jealousy on V.K.'s boyfriend's part, and instructed V.K. to "fix it[.]"  In another e-mail, B.A. instructed V.K. to "erase all of [their] past correspondences NOW"; to "use no personally identifying questions or comments unless [V.K.] immediately erase[d] them"; "to ONLY discuss 'normal or professional' things using [their] original 'normal' e-mail addresses" if V.K. "wish[ed] to

share [their] e-mails with others"; and to refrain from "shar[ing]" "any[]thing about [his] life . . . with anyone EVER unless [B.A.] specifically sa[id] otherwise."

The fact that V.K. responded to many of B.A.'s remote communications offers even further support for the conclusion that B.A.'s remote communications constituted exertions of authority, influence, or control over V.K. In replies to B.A.'s e-mails, V.K. provided information about her life in general and her boyfriend in particular. In one e-mail, V.K. thanked B.A. for a compliment. In another e-mail, V.K. declined to provide a photograph of herself. On one occasion, after B.A. telephoned V.K. at approximately midnight, V.K. participated in the telephonic conversation for approximately five hours.

In sum, B.A., while providing "temporary care" for V.K., took advantage of the ongoing teacher-student relationship to exert authority, influence, or control over V.K. via remote communications. As the ALJ concluded (and as B.A. fails to dispute), B.A.'s sexually explicit remote communications with V.K.—namely, informing her that he wanted her to pose in an erotic manner, propositioning her for sexual intercourse, and telling her during a telephonic conversation that he was masturbating—constituted sexual exploitation. Thus, the ALJ erred in concluding as a matter of law that the Department had not met its burden to prove that B.A. was responsible for indicated "sexual abuse" as defined by FL § 5-701(x)(1).[12]

---

[12]This case's material facts are clear and undisputed; stated otherwise, I do not know of any factual gaps in the record that require additional consideration by the ALJ. In particular, the e-mails between B.A. and V.K. speak for themselves. The ALJ concluded that B.A.'s sexually explicit remote communications with V.K. constituted sexual exploitation, and, in this Court, B.A. does not dispute that conclusion. The teacher-student

At oral reargument, the Department's counsel stated that she did not believe that B.A. had temporary care of V.K. when B.A. sexually exploited V.K. through remote communications. Of course, a party's erroneous concession of law does not bind this Court, which independently decides legal issues. See In re Heather B., 369 Md. 257, 266 n.9, 799 A.2d 397, 402 n.9 (2002) ("We independently decide issues of law and are not bound by a party's concession of law in a particular case." (Citation omitted)); Imbesi v. Carpenter Realty Corp., 357 Md. 375, 380 n.3, 744 A.2d 549, 551 n.3 (2000) ("A court . . . is not bound by an erroneous concession of law."). Regardless of the Department's erroneous concession of law in this case, B.A. had temporary care of V.K. when B.A. sexually exploited V.K. through remote communications.

Although CR § 3-324 (Sexual Solicitation of Minor) enables criminal prosecutions of sexual predators who use remote communications to prey on children, FL § 5-701 is the only means by which a county's Department of Social Services may take action against a sexual predator where, as here, the State elects not to prosecute the sexual predator.[13] Because the Majority interprets "sexual abuse" as defined by FL § 5-701(x)(1) to require

---

relationship between B.A. and V.K. was ongoing at the time of the sexual exploitation. And, as discussed above, B.A. exerted influence, authority, or control over V.K. Thus, the undisputed facts establish that B.A., while providing "temporary care," used an ongoing teacher-student relationship to exploit V.K. through remote communications.

[13]At oral reargument, the Department's counsel stated:

I can tell you, no prosecutor is going to pick up this case. There's too much to do out there to pick up a case where a teacher's maybe exploiting a child. I mean, that—the law enforcement went very far and investigated it, but these are the kinds of cases that don't get prosecuted. So, the only record of them, frequently, is the local department's ability to maintain its files.

in-person contact, it is incumbent upon the General Assembly to modernize FL § 5-701(x)(1) by amending it so that it applies to sexual predators who use remote communications to prey on children.

For the above reasons, respectfully, I dissent.

Judge Harrell has authorized me to state that he joins in this opinion.